[L.A. No. 31341. June 15, 1981.]

ERWIN OKUN, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY,
Respondent;
MAPLE PROPERTIES, Real Party in Interest.

[L.A. No. 31342. June 15, 1981.]

BETTY H. HARRIS et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY,
Respondent;
MAPLE PROPERTIES, Real Party in Interest.

446

COUNSEL

Yusim, Cassidy, Stein & Hanger, Robert T. Hanger, Alice Huston, Roger Bentley, Paul P. Selvin and Selvin & Weiner for Petitioners.

Stephen V. Bomse, Rebecca S. Eisenberg, Katherine H. Crocker, Heller, Ehrman, White & McAuliffe, Margaret C. Crosby, Alan L. Schlosser, Amitai Schwartz and Fred Okrand as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Levy & Norminton, Charles M. Levy and Thomas M. Norminton for Real Party in Interest.

OPINION

NEWMAN, J.—The complaint here alleges libel and slander during defendants' (petitioners') successful campaign for repeal of an ordinance that would have enabled plaintiff (real party in interest) to build a large condominium project in Beverly Hills. Our reading of the complaint persuades us that the publications in question could not reasonably be found libelous and that plaintiff's pleading of a conspiracy to slander is deficient.

The lawsuit was begun in September 1979. A first amended complaint names Betty Harris, Joann Ruden, Erwin Okun, and Does 1 through 1,000 as defendants and alleges 10 causes of action against various combinations of those defendants. Demurrers by Harris, Ruden, and Okun were sustained as to the first, seventh, eighth, ninth, and tenth causes, overruled as to the second, third, fifth, and sixth causes, and ordered off calendar as to the fourth cause (because it names only Doe defendants).

In response to the present petitions, we issued alternative writs of mandate inviting plaintiff and the trial court to show cause why the demurrers to the second, third, fifth, and sixth causes of action should not be sustained.

FACTUAL CONTEXT OF THE ALLEGED DEFAMATION

The first cause of action is not directly before us; but its introductory paragraphs, setting out background facts, are incorporated into each of the four causes whose sufficiency we now weigh. The paragraphs allege:

Plaintiff is a limited partnership that purchases, manages, develops, and sells real property. In 1977 it bought 10 acres of Beverly Hills property with a view to building condominiums. The property, then under a building moratorium pending determination of zoning, adjoined city-owned parcels. Plaintiff had discussed with city officials the possi-

bility of a land exchange so that plaintiff and the city each would own contiguous land. The discussions concluded successfully on November 28, 1978, when the city council agreed to the land exchange and adopted a zoning ordinance allowing plaintiff to construct condominiums on all its newly acquired property.

To prevent construction, defendants circulated and then filed a petition to allow the electorate to reject or accept the ordinance. Consequently the council placed it on the ballot for an election held March 9, 1979. It was rejected and thus repealed. Defendants were "motiviated by ill will toward [plaintiff]" and "campaigned against the passage of Proposition B in order to stop [plaintiff's] condominium project, among other ways, by defaming [plaintiff]. Said defendants variously and falsely accused [plaintiff] of corrupt and collusive activities in connection with City officials."

### SECOND CAUSE OF ACTION

The second cause alleges that Harris and Does 101 through 200 wrote this letter to the editor of the Los Angeles Times, wherein it was published on January 28, 1979:

#### "Setting the Record Straight

"The article regarding a controversial land swap between the Beverly Hills City Council and a developer of luxury condominiums ('Land Swap Stirs Up Beverly Hills' by Sam Kaplan, Dec. 26) missed the point entirely.

"To set the record straight:

"While the area in contention—adjacent to Beverly Hills' civic center—is known as the industrial area, it also houses the city's vital municipal services facilities. It is the site of the city's refuse transfer station, vehicle maintenance garages and all the other indispensable operations that make a city function. It is also the site of a water treatment plant that the city council abandoned in 1976.

"This action was followed by the council's abandoning the city's own water wells in the midst of the recent drought. It was this incredible move that caused a number of citizens to become suspicious of the council's motives. Beverly Hills residents were thus forced to become

completely dependent upon one very expensive source of water, that supplied by the Metropolitan Water District of Southern California. Even the MWD's general manager advised the city against this decision.

"Nevertheless, this was done despite the fact that in 1974 the voters of Beverly Hills had passed, by a two-thirds majority, a $3.75 million bond issue to refurbish the city's water wells and treatment facilities. The only council member opposed to the bond issue and retention of the city's wells was Richard Stone, an attorney.

"Mysteriously, one week after the voters approved the refurbishing of their water system, the city announced that its cost projections to revitalize the wells were $5 million short. Amazingly, a year later the claim went up to $12 million more than the voter-approved bonds. But, without asking the voters again, in December, 1976, the council closed down the wells and sold off the land on which they were located.

"Not until April 12, 1977, did Richard Stone, at that time the mayor of Beverly Hills, reveal that David Rowen, representing a developer, had become a client of Stone's. The abandoned treatment plant is now earmarked for the developers in a landswap deal."

Further it is alleged: The letter referred to plaintiff as the "developer" (see Code Civ. Proc., § 460) and was intended and reasonably understood to mean that plaintiff "had (a) conspired for a period of years with Councilman Stone to cause the City to abandon its water well system in order to make the water treatment plant obsolete and allow [plaintiff] to acquire the property on which the water treatment plant was located for [plaintiff's] private gain and (b) conspired to commit, and did commit, the crimes of bribery and corruption." The letter "as applied to [plaintiff], is false" and omits facts that, if included, "would not have caused the readers . . . to believe that plaintiff had acted as intimated in the [letter]." Harris wrote the letter "either intentionally knowing it was false or with reckless disregard for" truth. She did it "to injure [plaintiff] and stop any development by it" and was "motivated by malice and ill will toward plaintiff."

 Was the letter libelous? Clearly it permits a nondefamatory interpretation. The facts that in April 1977 plaintiff "had become a client of [council member] Stone" (who in 1974 had opposed retention of the city's wells), that in 1976 the wells and water treatment plant were

abandoned, and that in 1979 the treatment-plant site was "earmarked for the developers [plaintiff] in a landswap deal" do not necessarily imply wrongdoing. There is no explicit statement that Stone had represented plaintiff for any substantial period before April 1977 or was improperly influenced by plaintiff in his handling of city affairs.

■ Nonetheless a writing's susceptibility to innocent meaning does not in itself preclude a finding that an ordinary reader would understand it in a libelous sense. (*MacLeod* v. *Tribune Publishing Co.* (1959) 52 Cal.2d 536, 546-551 [343 P.2d 36]; see *Forsher* v. *Bugliosi* (1980) 26 Cal.3d 792, 803, 805 [163 Cal.Rptr. 628, 608 P.2d 716].) To show libelous meaning, plaintiff alleges by way of innuendo that the letter was understood to mean that plaintiff "conspired" with Stone to cause the city to abandon its wells so as to make the treatment plant obsolete and allow plaintiff to acquire the site "for private gain," and that plaintiff "conspired to commit, and did commit, the crimes of bribery and corruption." ■ However, "it is not the purpose of an innuendo to 'beget an action', and the meaning of the language complained of may not be enlarged or extended thereby. [Citations.] In other words, it is the office of the innuendo to merely explain or interpret, without enlarging, the alleged libelous publication." (*Bates* v. *Campbell* (1931) 213 Cal. 438, 442-443 [2 P.2d 383].)

■ Here, plaintiff's innuendo allegations are not supported by the letter's words. The implications deprecatory to plaintiff are mere opinion, not libelous. ■ "An essential element of libel ... is that the publication in question must contain a false statement of *fact*. . . . This requirement ... is constitutionally based. The reason for the rule, well stated by the high court, is that 'Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas.' (*Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323, 339-340, fn. omitted . . . .) [¶] The critical determination of whether the allegedly defamatory statement constitutes fact or opinion is a question of law. [Citations.] The distinction frequently is a difficult one, and what constitutes a statement of fact in one context may be treated as a statement of opinion in another, in light of the nature and content of the communication taken as a whole. Thus, where potentially defamatory statements are published in a public debate, a heated labor dispute, or in another setting in which the audience may anticipate efforts by the parties to persuade others to their positions by use of epithets, fiery rhetoric or hyperbole, language which generally

might be considered as statements of fact may well assume the character of statements of opinion." (*Gregory* v. *McDonnell Douglas Corp.* (1976) 17 Cal.3d 596, 600-601 [131 Cal.Rptr. 641, 552 P.2d 425].)

■ *Gregory* also confirms that, short of accusations of crime or personal dishonesty, the First Amendment protects even sharp attacks on the character, motives, or moral qualifications of "a public officer or . . . an active participant in a labor dispute." (*Id.*, at p. 604.) There is an analogous leeway for criticism of an individual who voluntarily injects himself or herself into public controversy and so becomes a "public figure." (See *Vegod Corp.* v. *American Broadcasting Companies, Inc.* (1979) 25 Cal.3d 763, 767, 769 [160 Cal.Rptr. 97, 603 P.2d 14].) ■ Plaintiff's participation here made it a public figure. (*Greenbelt Pub. Assn.* v. *Bresler* (1970) 398 U.S. 6, 8-9 [26 L.Ed.2d 6, 11-12, 90 S.Ct. 1537] (developer seeking variances to build high-density housing "clearly fell within even the most restrictive definition of a 'public figure'").)

By those standards the Harris letter is not defamatory. It does criticize abandonment of the wells and treatment plant as unwise, "incredible," a product of "suspicious" motives, and a flouting of the voters' wishes. It reports Councilman Stone's April 1977 revelation that he had become plaintiff's attorney but asserts no conduct by Stone other than his being the only council member to oppose the water-supply bond issue three years earlier. The implication that he and other council members were motivated by selfish interest rather than the public good is well within the bounds of protected political debate. (*Scott* v. *McDonnell Douglas Corp.* (1974) 37 Cal.App.3d 277, 289-291 [112 Cal.Rptr. 609].) A statement regarding (1) a public official's business, social, or political affiliations, and (2) how those affiliations seem reflected in decision-making hardly constitutes a libelous charge of bribery and corruption. A contrary ruling would inhibit a significant segment of the discourse vital in a democracy. (See *Desert Sun Publishing Co.* v. *Superior Court* (1979) 97 Cal.App.3d 49 [158 Cal.Rptr. 519]; *Sierra Breeze* v. *Superior Court* (1978) 86 Cal.App.3d 102 [149 Cal.Rptr. 914].)

Plaintiff argues that the letter's title ("To Set the Record Straight") and the words "mysteriously" and "amazingly" in its next-to-last paragraph suggest that the writer knew of unstated improprieties between plaintiff and Stone. (See Rest.2d Torts, § 566 ("a statement in the form of an opinion . . . is actionable only if it implies the allegation of undis-

closed defamatory facts as the basis for the opinion").) The letter's apparent aim, though, was to disclose whatever pertinent facts were known to the writer. "Mysteriously" and "amazingly" suggest that she did not have knowledge of underlying reasons for the council's actions, though the words also may imply an opinion that the reasons might be subject to severe criticism if revealed. Rather than implying unstated facts, the letter seems "cautiously phrased in terms of apparency." (*Gregory, supra,* 17 Cal.3d at p. 603; *Information Control Corp.* v. *Genesis One Computer Corp.* (9th Cir. 1980) 611 F.2d 781, 783 (California law).)[1]

*Good Government Group of Seal Beach, Inc.* v. *Superior Court* (1978) 22 Cal.3d 672 [150 Cal.Rptr. 258, 586 P.2d 572] is distinguishable. Defendants there stated that plaintiff and other council members "extorted by blackmail $100,000 from [a developer]" in exchange for concessions to the city. (*Id.,* at p. 678.) This court pointed out that, though some charges of "blackmail" may in context not be susceptible of libelous interpretation (*Greenbelt Pub. Assn.* v. *Bresler, supra,* 398 U.S. 6), the Seal Beach publication could be found defamatory because it omitted the fact that the $100,000 was paid to the city rather than to plaintiff and his colleagues. (22 Cal.3d at pp. 681, 683.)

## THIRD CAUSE OF ACTION

The third cause alleges that Okun and Does 201 through 300 wrote an open letter to the mayor that was published in the Beverly Hills Courier on October 13, 1978. Only the last six of the letter's twenty-four paragraphs are alleged to be libelous. The first 18, incorporated as an exhibit, address the merits of the controversy alleged in the first cause of action.[2] The last six state:

---

[1]After oral argument, plaintiff formally requested that we take judicial notice of the answer to a petition for hearing arising out of a discovery proceeding in a separate libel suit by Stone based on the same letter. The stated purpose of the request is to call to our attention the answer's assertions that particular factual statements in the letter are false. The assertions add nothing to the complaint's allegations that the statements are false. Their falsity, if proved, would not make them defamatory. (*Blackhawk Corp.* v. *Ewing* (1979) 94 Cal.App.3d 640 [156 Cal.Rptr. 581].)

[2]The first 18 paragraphs are as follows: "I strongly object to your recent public statements describing the opposition to the industrial zone development plans as 'a dozen ladies and that's all they are.' [¶] Your remarks are insulting, condescending, arrogant and totally without merit. There's also a bit of male chauvinism lurking there. [¶] The number of residents opposed to the plans are far greater than a dozen, including men and women, who care deeply about the future independence of this city. [¶] If the 'doz-

"The entire industrial zone scenario reads uncomfortably like a John D. MacDonald novel of Florida land wheeler-dealers mired up to their necks in deception of the public. [¶] One of our elected officials has already disqualified himself from voting because of real or potential conflict of interest. [¶] You [Mayor Tilem] have now exhibited prejudice publicly to those in opposition and should disqualify yourself. [¶] One of the three council-members left is a real estate developer, obviously sympathetic to fellow builders and realtors, though he has no business interests in the city. [¶] That leaves two, and we elected five to the council to represent us. [¶] Isn't it time to remove the clouds of suspicion, innuendo, rumor, secret talks and shrouded negotiation and return the matter to the people in the form of a referendum?"

 The innuendo pleading is directed solely at the first sentence, concerning the John D. MacDonald novel. It is alleged that the novel, titled *Condominium*, "is about a fictional company, the Marliss Corporation, which bribes public officials and engages in other illegal activities so that it can build dangerously defective buildings." Okun's letter is alleged to have referred to plaintiff as the "Florida land wheeler-dealers" and to have been intended and reasonably understood as meaning that plaintiff "was engaging in illegal and collusive activities similar to those of the Marliss Corporation in *Condominium*." The

---

en' you are referring to are the individuals who have addressed the council on the zoning matter, you are putting down some very fine, dedicated people, including several elected representatives of civic and community-action groups. They speak for far more than themselves. [¶] Their only vested interest is the well-being, integrity and continued viability of our city. [¶] But who speaks publicly in defense of the plan? [¶] The developer's banker, the developer's contractor, the developer's advertising man, the developer's sales agent, the developer's etc. [¶] You have also stated that you 'would certainly never sign papers to trade away land that we need.' But what else are you doing if you proceed with this plan? [¶] The 'dozen ladies' and others keep asking the same pertinent, valid questions that, if answered, could put all arguments to rest. [¶] However, only evasive, obtuse and hardly reassuring responses come back. [¶]—Where will our municipal services go? [¶]—Why should the city incur enormous costs to move them? [¶]—Are we going to become a contract city, beholden to outside vendors? [¶]—Where will our water come from when we are totally at the mercy of the MWD and rates treble and we are in a drought worse than the recent one? [¶]—Why are we trading land which we should be buying—like other cities that are landbanking for the future? [¶] But the even larger question is who will gain from this plan? The majority of residents, or the very few individuals with a vested interest in the condominium project? [¶] And what about all the ambiguous promises to the senior citizens? The 100-unit housing promise is a blatant, political carrot in return for their dedicated support. [¶] Can you honestly tell the folks there really will be such a building for them exclusively? What will the costs be? $300 a month? $650? Who will determine those with highest priority? How can you restrict entry to city residents only, if state and federal money is involved? And what about the hundreds and hundreds of needy, Beverly Hills seniors who will be left out?"

allegations of falsity, omission of material facts, and malice are parallel to those in the second cause of action.

Clearly the letter's statement about the novel is one that "assume[s] the character . . . of opinion" when "potentially defamatory statements are published in a public debate, a heated labor dispute, or in another setting in which the audience may anticipate efforts . . . to persuade . . . by use of epithets, fiery rhetoric or hyperbole" (*Gregory, supra,* 17 Cal.3d at p. 601). Though perhaps it imputes vigorous lobbying to plaintiff and denounces plaintiff's project as inimical to the city's interest, the letter cannot fairly be read as charging bribery or other crime.

FIFTH CAUSE OF ACTION

The fifth cause ("Conspiracy to Commit Libel") alleges that beginning in January 1978 Harris, Ruden, Okun, and Does 401 through 500 "conspired to discredit [plaintiff] and destroy its reputation in the community for the purpose of stopping any development by [plaintiff]," that they did the acts described in the first, second, and third causes of action (incorporated by reference) in furtherance of the conspiracy, and that they "were motivated by malice and ill will toward [plaintiff]."

■ A complaint for civil conspiracy states a cause of action only when it alleges the commission of a civil wrong that causes damage. Though conspiracy may render additional parties liable for the wrong, the conspiracy itself is not actionable without a wrong. (*Unruh* v. *Truck Insurance Exchange* (1972) 7 Cal.3d 616, 631 [102 Cal.Rptr. 815, 498 P.2d 1063]; *Chicago Title Ins. Co.* v. *Great Western Financial Corp.* (1968) 69 Cal.2d 305, 316 [70 Cal.Rptr. 849, 444 P.2d 481]; *Pettitt* v. *Levy* (1972) 28 Cal.App.3d 484, 491 [104 Cal.Rptr. 650].) Accordingly the demurrer to the fifth cause should have been sustained if no actionable conduct is alleged in the first, second, or third causes. Having established the insufficiency of the second and third, we turn to the first.

■ The statements that the first cause identifies as libelous appear in an "Argument Against Proposition B" allegedly prepared by Harris, Ruden, and Does 1 through 100 and included in the "Sample Ballot and Voter Information Pamphlet" mailed to the voters in connection with the election on March 6, 1979. It reads:

## "ARGUMENT AGAINST PROPOSITION B

"Beverly Hills has only one Industrial Area to sustain us as an independent city. *We must keep it for our community needs and not allow it to be zoned away.*

*"Vote No on Proposition B.*

"We need a place for police cars, carpentry and paint shops, city truck maintenance, park equipment, trash disposal, water facilities and other lifeline services essential to our community.

"These indispensable city services enable Beverly Hills to operate efficiently and at low cost. They must be contained in the Industrial Area for they are unpleasant neighbors. *We cannot afford to allow developers to take over the only suitable location within our city for these vital needs.*

"Every citizen approved General Plan designated this land to be saved for municipal and service use. The developers hired one of our Councilmen, subsequently the Fair Political Practices Commission ruled the Councilman had a conflict of interest. The General Plan was changed drastically to accommodate the developer's desires, ignoring residents' needs.

"The Council violated the recommendation of their own consultant and the Council-appointed citizens committees when it voted this rezoning.

"THIS SCHEME WILL COST THE TAXPAYERS MILLIONS. Rubbish disposal has to be moved, street intersections redesigned, businesses relocated, city services put underground, all at prohibitive costs to taxpayers.

"ONLY THE DEVELOPERS BENEFIT FROM THIS REZONING. They will sell condominiums at up to $1,000,000.00 each, which the taxpayers will subsidize. They will get city maintained landscaping. By the Council's own admission, these luxury condominiums will cost the city more to service than revenues they will produce.

"Senior Housing is being used as a deceptive cover for this 'Enrich the Developers' scheme.

*"Don't jeopardize our city's future!* VOTE NO ON PROPOSITION B.

"JOANN RUDEN, President BETTY H. HARRIS, Chairperson
League of Women Voters of Beverly Hills Committee to Save
 Beverly Hills"

The alleged libel begins with "Every citizen approved General Plan designated this land to be saved ..." and ends with "Senior Housing is being used as a deceptive cover for this 'Enrich the Developers' scheme." The alleged innuendo is that defendants "intended to convey to their readers that [plaintiff] entered into a corrupt and collusive arrangement with a City Councilman which led to the City Council adopting the Zoning Ordinance ...."[3] The pleading of falsity, omission of material facts, and malice is parallel to that in the second and third causes of action.

Would an ordinary voter understand the ballot argument to mean that plaintiff entered into a "corrupt and collusive arrangement" with a councilman that lead to adoption of the zoning ordinance? The argument states that the developers (plaintiff) "hired one of our Councilmen, subsequently the Fair Political Practices Commission ruled the Councilman had a conflict of interest." That plaintiff "hired" a councilman conveys no more than they formed a business relationship. What of the FPPC ruling? One of the commission's functions is to issue advisory rulings that concern possible conflict of interest involving state or local public officials. Good faith compliance with a ruling is generally a defense against enforcement of civil or criminal sanctions. (Gov. Code, §§ 83114, 87100 et seq.) The fact of a ruling that a councilman had a conflict of interest does not imply that he acted improperly on matters affected by the conflict but only that he was advised against doing so. The ballot argument does not mention bribery or other crimi-

---

[3]The complete innuendo pleading is as follows: "By publishing the Libelous Statement, defendants Harris, Ruden, and Does 1 through 100, inclusive, intended to convey to their readers that [plaintiff] entered into a corrupt and collusive arrangement with a City Councilman which led to the City Council adopting the Zoning Ordinance which purportedly the Council's consultant and a citizen's committee recommended against adopting; which drastically changed the General Plan unanimously adopted by the public; that would cost the City millions without benefiting the City; which would obligate the City to landscape and provide other services for the condominiums being constructed by [plaintiff]; and that [plaintiff] had provided for senior citizens housing as a deceptive cover to enrich itself."

Apart from the passage concerning "a corrupt and collusive arrangement," even a statement in the innuendo's exact words would not have been libelous in the context of the controversy surrounding the election.

nal conduct and does not imply undisclosed knowledge of wrongdoing. Like the letters in the second and third causes, the ballot argument could not reasonably have been interpreted by its probable readers as having a libelous meaning.

### SIXTH CAUSE OF ACTION

The sixth cause is for "conspiracy to commit slander." It alleges that defendants Harris, Ruden, Okun, and Does 501 through 600 "conspired to discredit [plaintiff] and destroy its reputation in the community for the purpose of stopping any development by [plaintiff]," that they "did the acts described in this Sixth Cause of Action in furtherance of the aforesaid conspiracy," and that they "were motivated by malice and ill will toward [plaintiff]." As with the fifth cause, the sufficiency of the sixth depends on whether it alleges actionable wrongdoing.

It purports to do so only by incorporating paragraphs of the fourth cause. The sole misconduct that those paragraphs allege is the making of a "slanderous statement" by "defendants does 301 through 400." There is no allegation of wrongful conduct by any of the defendant-conspirators—Harris, Ruden, Okun, and Does 501 through 600. Accordingly, the sixth cause fails to state a claim against any defendant.

Though that defect regarding parties requires sustaining the demurrer to the sixth cause, it might not preclude an amendment identifying some individual as both one of the Does 501 through 600 and one of the Does 301 through 400. (See *Marasco v. Wadsworth* (1978) 21 Cal.3d 82 [145 Cal.Rptr. 843, 578 P.2d 90]; *Smeltzley v. Nicholson Mfg. Co.* (1977) 18 Cal.3d 932 [136 Cal.Rptr. 269, 559 P.2d 624, 85 A.L.R.3d 121]; *Austin v. Massachusetts Bonding & Insurance Co.* (1961) 56 Cal.2d 596 [15 Cal.Rptr. 817, 364 P.2d 681].) Thus we consider whether the fourth cause sufficiently alleges actionable wrongdoing by Does 301 through 400.

The sole purportedly wrongful act charged appears in this allegation: "[Plaintiff] is informed and believes and, based on such information and belief, alleges that within one year last past, defendants Does 301 through 400, inclusive, made the following oral statement (the 'Slanderous Statement'): that [plaintiff] had entered into a corrupt relationship with Councilman Stone, and Stone, pursuant to this arrangement, had improperly influenced the City Planning Commission and staff and the City Council in order to favor [plaintiff] in zoning and land trades with

the City and had unlawfully used his influence as a City Councilman for the private gain of [plaintiff]. Defendants Does 301 through 400, inclusive, made the Slanderous Statement to members of the Beverly Hills community."

By way of innuendo it is alleged that the "Slanderous Statement" was intended and understood to mean that plaintiff "had committed the crimes of bribery and corruption." Falsity and malice are alleged in the same manner as in the second and third causes of action, except that there is no allegation of omission of material facts.

Defendants contend the allegation of slander is fatally inexact as to time and place of utterance and persons addressed. Yet the pleading does seem certain enough in those respects. █ Less particularity is required when it appears that defendant has superior knowledge of the facts, so long as the pleading gives notice of the issues sufficient to enable preparation of a defense. (*Bradley* v. *Hartford Acc. & Indem. Co.* (1973) 30 Cal.App.3d 818, 825 [106 Cal.Rptr. 718]; *Schessler* v. *Keck* (1954) 125 Cal.App.2d 827, 835 [271 P.2d 588] (upholding pleading on information and belief).) Nor is the allegation defective for failure to state the exact words of the alleged slander. Notwithstanding an early dictum cited here (*Haub* v. *Friermuth* (1905) 1 Cal.App. 556, 557 [82 P. 571]), we conclude that slander can be charged by alleging the substance of the defamatory statement. (See *Lipman* v. *Brisbane Elementary Sch. Dist.* (1961) 55 Cal.2d 224, 235 [11 Cal.Rptr. 97, 359 P.2d 465]; *Schessler* v. *Keck, supra*, 125 Cal.App.2d 827, 830 (sustaining allegation of statement that "plaintiff was being treated for syphilis ... and ... should not be employed as a cook"); cf. *des Granges* v. *Crall* (1915) 27 Cal.App. 313, 315 [149 P. 777] (requiring exact pleading of words of libel).)

Might a trier of fact reasonably find that the alleged statement conveyed a slanderous meaning?[4] More particularly, might a "member of the Beverly Hills community" properly be found to understand the statement as charging that plaintiff "had committed the crimes of bribery and corruption"?

---

[4]Civil Code section 46 defines slander as follows: "Slander is a false and unprivileged publication, orally uttered, and also communications by radio or any mechanical or other means which: 1. Charges any person with crime, or with having been indicted, convicted, or punished for crime; 2. Imputes in him the present existence of an infectious, contagious, or loathsome disease; 3. Tends directly to injure him in respect to his office, profession, trade or business, either by imputing to him general disqualification

The complaint makes clear that the statement was part of the debate over whether the city should permit plaintiff's condominium project.[5] Thus it was in a "setting in which the audience may anticipate efforts ... to persuade ... by use of epithets, fiery rhetoric or hyperbole" (*Gregory, supra,* 17 Cal.3d at p. 601). ■ The vague charge that plaintiff "entered into a corrupt relationship with Councilman Stone" was not a factual assertion of crime but rather an expression of opinion. In context, "corrupt" implied moral criticism of objectives and methods, not the occurrence of bribery. Equally deprecatory words often have been ruled nondefamatory in parallel circumstances. (*Good Government Group of Seal Beach, Inc.* v. *Superior Court, supra,* 22 Cal.3d 672, 678, 681 ("chicanery and machinations"); *Gregory, supra,* 17 Cal.3d 596, 599, 603 (labor union officer charged with "seek[ing] personal gain and political prestige rather than [serving] the best interests of the members"); *Desert Sun Publishing Co.* v. *Superior Court, supra,* 97 Cal.App.3d 49 ("chicanery"); *Sierra Breeze* v. *Superior Court, supra,* 86 Cal.App.3d 102 (charge that county supervisor "vote[d] to squander property tax funds"); *Scott* v. *McDonnell Douglas Corp., supra,* 37 Cal.App.3d 277, 284, 288-291 (city manager said to be not "dedicated to efficiently and honestly administer the affairs of the City").)

The charge that "pursuant to this arrangement" Councilman Stone "improperly" and "unlawfully" influenced the city in favor of plaintiff is merely rhetorical hyperbole. "An allegedly defamatory statement may constitute a fact in one context but an opinion in another, depending upon the nature and content of the communication taken as a whole." (*Good Government Group of Seal Beach, Inc.* v. *Superior Court, supra,* 22 Cal.3d 672, 680.) In *Good Government* a statement that city council members "extorted by blackmail $100,000 from [a developer]" was held subject to defamatory interpretation because it described a specific incident and failed to explain that the $100,000 was paid to the city. (*Id.,* at pp. 681, 683.) Here the use of "improperly" and "unlawfully," unadorned by reference to or insinuation of undisclosed knowledge of a particular criminal act, could not be understood to be more than a con-

---

in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profits; 4. Imputes to him impotence or a want of chastity; or 5. Which, by natural consequence, causes actual damage."

[5]The allegation that the statement was made "within one year last past" encompasses utterances after the referendum of March 9, 1979. However, that referendum dealt only with the zoning ordinance, not the land-exchange agreement; further, the alleged purpose of both the conspiracy to slander and the slander itself was to "stop any development by" plaintiff.

stitutionally protected expression of severe disapproval of noncriminal conduct.

## LEAVE TO AMEND?

On the sustaining of demurrers to the second, third, fifth, and sixth causes of action should plaintiff be given leave to amend? Sufficiency of the second, third, and fifth causes turns on the presence of libel in two letters and a ballot argument. Each of those documents is nonlibelous when read in light of circumstances alleged here that would have to be considered even if omitted from an amended pleading (*Reichert* v. *General Ins. Co.* (1968) 68 Cal.2d 822, 836-837 [69 Cal.Rptr. 321, 442 P.2d 377]). Accordingly, leave to amend those three causes should be denied because "there are no circumstances under which an amendment would serve any useful purpose" (*Routh* v. *Quinn* (1942) 20 Cal.2d 488, 493-494 [127 P.2d 1, 149 A.L.R. 215]) and "speedy resolution of cases involving free speech is desirable" to avoid "a chilling effect upon the exercise of First Amendment rights" (*Good Government, supra,* 22 Cal.3d at p. 685).

The sixth cause, on the other hand, turns on the allegedly slanderous nature of an oral statement that is set forth only in substance. Though the statement as presently pleaded could not be found defamatory, the form of the sixth cause does not preclude the possibility of an amendment that would allege slander in furtherance of the conspiracy charged against Okun, Harris, and Ruden. Leave to amend thus should be granted. ■ (*Youngman* v. *Nevada Irrigation Dist.* (1969) 70 Cal.2d 240, 245 [74 Cal.Rptr. 398, 449 P.2d 462] ("If there is any reasonable possibility that the plaintiff can state a good cause of action, it is error to sustain a demurrer without leave to amend"); *MacLeod* v. *Tribune Publishing Co.* (1959) 52 Cal.2d 536, 542 [343 P.2d 36]; *Lemoge Electric* v. *County of San Mateo* (1956) 46 Cal.2d 659, 664 [297 P.2d 638] ("great liberality should be exercised in permitting a plaintiff to amend").)

Let a peremptory writ issue, directing respondent court (1) to vacate its order overruling petitioners' demurrers to the second, third, fifth, and sixth causes of action, and (2) to issue an order sustaining the demurrers to the second, third, and fifth causes of action without leave to amend and sustaining the demurrers to the sixth cause of action with leave to amend. Petitioners shall recover costs against real party in interest.

Tobriner, J., Richardson, J., and Cologne, J.,* concurred.

**MOSK, J.**—I concur in the opinion and in the judgment as to the second, third and fifth causes of action, but I dissent from the order permitting leave to amend the sixth cause of action. The further prolongation of this litigation would be as misguided as its origin. (Cal. Const., art. I, § 2; *Wilson* v. *Superior Court* (1975) 13 Cal.3d 652 [119 Cal.Rptr. 468, 532 P.2d 116].)

The majority conclude that the plaintiffs might possibly identify one of the several hundred Does sued as defendants and thus establish a conspiracy to slander. I suggest that since plaintiffs have not proposed to further amend their complaint to name any additional defendants at any time after the lawsuit was filed in 1979, an ineluctable conclusion follows that they are unable to do so at this late date.

Defendants filed a general demurrer and it is that general demurrer on which the court is ruling. In many circumstances sustaining a special demurrer might justify a belated opportunity to amend, but we have found, as I read the majority opinion, that no cause of action has been stated. Naming an identifiable live human being in place of a fictitious Doe, even if it can be done, will add nothing to the substance of the complaint.

As I stated recently in my concurring and dissenting opinion in *Deas* v. *Knapp* (1981) 29 Cal.3d 69, 80 [171 Cal.Rptr. 823, 623 P.2d 775], there comes a time when the finality of litigation is almost as important as the decision therein. In the preservation of the free exercise of speech, writing and the political function, the early termination of this lawsuit is highly desirable. We should discourage attempts to recover through the judicial process what has been lost in the political process.

Bird, C. J., and Brown (Gerald), J.,* concurred.

Petitioners' applications for a rehearing were denied July 15, 1981. Brown (Gerald), J.,* and Cologne, J.,* participated therein. Bird, C. J., Mosk, J., and Brown (Gerald), J.,* were of the opinion that the applications should be granted as to court's action on sixth cause of action.

---

*Assigned by the Chairperson of the Judicial Council.