[No. A017025. First Dist., Div. Two, Dec. 9, 1982.]

TONY BILL et al., Petitioners, v.
THE SUPERIOR COURT OF THE CITY AND COUNTY OF
SAN FRANCISCO, Respondent;
JOCELYN VARGAS, a Minor, etc., et al., Real Parties in Interest.

**COUNSEL**

Robert R. Callan, Lawrence J. Siskind and Cooper, White & Cooper for Petitioners.

No appearance for Respondent.

Joseph W. Carcione, Jr., and Belkin & Carcione for Real Parties in Interest.

**OPINION**

**GRODIN, P. J.**—Petitioners have sought an extraordinary writ to compel the trial court to vacate its order denying their motion for summary judgment, and to enter a contrary order. For reasons we shall explain, we consider this to be one of the exceptional cases in which relief at the pleading stage of a pending action is warranted. (See *Babb* v. *Superior Court* (1971) 3 Cal.3d 841, 851 [92 Cal.Rptr. 179, 479 P.2d 379]; *Stencel Aero Engineering Corp.* v. *Superior Court* (1976) 56 Cal.App.3d 978, 984 [128 Cal.Rptr. 691]; *G. D. Searle & Co.* v. *Superior Court* (1975) 49 Cal.App.3d 22, 24 [122 Cal.Rptr. 218].)

On March 24, 1979, Jocelyn Vargas attended a movie, "Boulevard Nights," at the Alhambra Theatre on Polk Street in San Francisco. After leaving the

theater, as she and her friends were walking down the street to catch a bus, she was shot by someone who, it is alleged, was a "member of the general public prone to violence . . . who had been attracted to said Alhambra Theatre by the showing of said violent movie . . . ." Through her mother, as guardian, she has sued various defendants, including petitioners, who are alleged to be the producers of the movie. Her mother, alleging damage for medical treatment and loss of services, is also a plaintiff. Their complaint, as relevant here, is that petitioners "knew, or should have known, that said movie was a violent movie and would attract certain members of the public to view said movie who were prone to violence and who carried weapons . . . [and] would, or were likely to cause grave bodily injury upon other members of the general public at or near the showing of said movie," but that petitioners "negligently failed to warn" Jocelyn of these facts, and "negligently failed to take sufficient steps to protect patrons," such as herself, "at and near said Alhambra Theatre." In a second cause of action, plaintiffs allege in addition that petitioners "willfully allowed the showing of said movie to the general public, knowing and thereby impliedly representing to members of the general public . . . that said movie could be viewed in safety," that they "intended that patrons, such as Jocelyn Vargas, should rely on their representations," and she did so rely, to her detriment.

Petitioners are the executive producer of the film (Tony Bill), the producer (Bill Benenson), the director (Michael Pressman), and Eastside Productions, Inc., a corporate entity whose stock is totally owned by Tony Bill and Bill Benenson, and which provided the services of petitioners to Warner Brothers, Inc., for the making of the film. The contract between Eastside and Warner Brothers provides that all advertising and publicity rights in the film and in the production of the film vest exclusively in Warner Brothers. It also provides for a sharing of certain profits from the film between Warner Brothers and petitioners.

There was evidence before the court on the motion for summary judgment that, notwithstanding the terms of the contract, petitioners Bill and Benenson collaborated with Warner Brothers in the preparation of "trailers" for the film, and in certain advertising for the film. Plaintiffs do not suggest, however, and there was no evidence, that the trailers or the advertisements themselves contributed to the danger of violence at theaters where the movie was shown.

There was also evidence that, prior to the opening of the film in Los Angeles, petitioner Pressman discussed with Benenson that "Warner Bros. should consider having security at some of the theaters," and that Benenson did suggest to Warner Brothers that there be a guard or guards outside the theater in Los Angeles. Pressman testified that this suggestion was made because some of the press was linking "Boulevard Nights" with another film, "The Warriors"

(which had opened earlier), as both being "gang movies," the inference being that some violence attended the showing of "The Warriors."

Finally, the trial court had before it a declaration from Jocelyn Vargas in which she stated that petitioners "represented to me and other members of the general public that this movie could be attended in safety," that she was not "warned or made aware of the likelihood or even the possibility that violence might occur at or near theatres showing this movie," and that if she had been warned she would never have gone. The nature or form of the asserted representation is not described. Plaintiffs do not contend that there existed an express representation, but rather that a representation that the movie could be attended in safety might be implied from advertisements inviting attendance.

DISCUSSION

I.

Petitioners, in support of their argument that they were entitled to summary judgment as a matter of law, rely heavily upon *Olivia N.* v. *National Broadcasting Co.* (1981) 126 Cal.App.3d 488 [178 Cal.Rptr. 888]. In that case the plaintiff, who had been sexually assaulted with a bottle, sued the National Broadcasting Company and the Chronicle Broadcasting Company, claiming that the assailants had been incited to that action by a television broadcast of the film "Born Innocent," in which a similar scene was depicted. The trial court, after viewing the film, granted defendants' motion for nonsuit, and Division Four of this court affirmed. In an opinion, authored by Justice Christian, the court stated: "Appellant does not seek to impose a prior restraint on speech; rather, she asserts civil liability premised on traditional negligence concepts. But the chilling effect of permitting negligence actions for a television broadcast is obvious. 'The fear of damage awards . . . may be markedly more inhibiting than the fear of prosecution under a criminal statute.' (*New York Times Co.* v. *Sullivan* [1964] 376 U.S. 254, 277 . . . .) Realistically, television networks would become significantly more inhibited in the selection of controversial materials if liability were to be imposed on a simple negligence theory. . . . The deterrent effect of subjecting the television networks to negligence liability because of their programming choices would lead to self-censorship which would dampen the vigor and limit the variety of public debate. [¶] Although the First Amendment is not absolute, the television broadcast of 'Born Innocent' does not, on the basis of the opening statement of appellant's attorney, fall within the scope of unprotected speech. Appellant concedes that the film did not advocate or encourage violent acts and did not constitute an 'incitement' within the meaning of *Brandenburg* v. *Ohio* [1969] 395 U.S. 444, 447-448 . . . . In-

citement is the proper test here. . . . Thus [the broadcast] is constitutionally protected." (126 Cal.App.3d at pp. 494-495.)[1]

Plaintiffs would distinguish *Olivia N.* on the ground that they do not seek to impose liability on the basis of the content of the motion picture—indeed, they suggest that so far as their theory is concerned, the movie might as well have been "Mary Poppins" rather than "Boulevard Nights." They do not allege that the movie incited or stimulated members of the public to violence, but rather that it would attract members of the public who were predisposed to violence, that petitioners knew that, and, knowing that, had a duty to warn and/or provide protection.

The distinction fails to dispose of the First Amendment concerns expressed in *Olivia N.*, however, for it is apparent that if the showing of the movie "Boulevard Nights" tended to attract violence-prone persons to the vicinity of the theater, it is precisely because of the film's content, and for no other reason. The very basis of plaintiffs' factual showing in the trial court was that the media was linking "Boulevard Nights" with another movie, "The Warriors," the exhibition of which allegedly resulted in actual incidents of violence, as being "gang movies." Plaintiffs claim that petitioners were aware that the other movie "glorified violence," and their complaint refers to "Boulevard Nights" as a "violent movie." It is thus implicit in plaintiffs' theory that the film

---

[1]Similar authority exists in other states, in suits based upon the alleged impact of a film or television show upon the viewer.

In *Walt Disney Productions, Inc.* v. *Shannon* (1981) 247 Ga. 402 [276 S.E.2d 580], the Georgia Supreme Court affirmed summary judgment for defendants in a suit seeking recovery for damages arising out of a minor's attempt to duplicate a magic trick shown on the Mickey Mouse Club show. The court opined that "the plaintiff in this case is seeking to hold the defendants liable in tort for statements communicated to the plaintiff through the medium of television. This highlights the fact that this case does involve questions concerning freedom of speech or expression." (*Id.*, at p. 403.)

Recently, in *DeFilippo* v. *National Broadcasting Co., Inc.* (1982) — R.I. — [446 A.2d 1036], plaintiff's 13-year-old son accidentally hung himself while attempting to duplicate a stunt performed on the Tonight Show by Johnny Carson. Plaintiff alleged that NBC had "negligently failed to adequately warn and inform" its young audience, and that defendants had acted maliciously, placing their financial interests above those of the plaintiff and the deceased minor. The Rhode Island Supreme Court, relying upon *Olivia N.* and distinguishing *Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 40 [123 Cal.Rptr. 468, 539 P.2d 36], concluded that permitting tort liability on these theories of recovery would result in self-censorship by broadcasters intent upon avoiding lawsuits.

See also *Zamora* v. *Columbia Broadcasting System* (S.D.Fla. 1979) 480 F.Supp. 199, holding that the First Amendment barred a damage suit for violation of an alleged duty to avoid making violent shows available for consumption by susceptible viewers.

Article I, section 2 of the state Constitution constitutes "[a] protective provision more definitive and inclusive than the First Amendment." (*Wilson* v. *Superior Court* (1975) 13 Cal.3d 652, 658 [119 Cal.Rptr. 468, 532 P.2d 116]; *Robins* v. *Pruneyard Shopping Center* (1979) 23 Cal.3d 899, 908 [153 Cal.Rptr. 854, 592 P.2d 341].) State action violative of the First Amendment is, therefore, a fortiori violative of the state Constitution. For convenience, we use the term "First Amendment" in this opinion as a shorthand identification of the free speech guarantees contained in both federal and state Constitutions.

"Boulevard Nights" attracted violence-prone persons to the vicinity of the theater because it was about gangs, or because it was "violent," or because it was perceived to be similar in content to "The Warriors," or some combination of these factors.

Therefore, if liability were imposed upon the petitioners in this situation, First Amendment concerns would undoubtedly be implicated though perhaps less directly than in *Olivia N.*. Film producers considering a movie about gangs, or about violence, or bearing some resemblence to a movie which attracted violence-prone persons, would be required to take into account the potential for liability to patrons for acts of violence on the part of persons over whom the producers would have no control. If, under such circumstances, they were held to have a duty to warn potential patrons of the risk of attending their movie, they would have to anticipate that the warning would deter substantial portions of the public from attending it—as Jocelyn Vargas says she would have been deterred if a warning had been given. And if, under such circumstances, they were held to be responsible for providing security protection at and in the vicinity of every theater at which the movie is shown, including public streets, the attendant costs might be substantial indeed. It is thus predictable that the exposure to liability in such situations would have a chilling effect upon the selection of subject matter for movies similar to the effect which concerned the court in *Olivia N.*

Instructive also, in this context, is the general First Amendment principle that when speech is of such a nature as to arouse violent reaction on the part of the lawless, the first obligation of government is to maintain the peace and enforce the law, and not to silence or punish the speaker.[2] Were this not the rule, all speech would be subject to the "heckler's veto." (Kalven, The Negro and the First Amendment (1965) pp. 140-144.) While this is not a situation in which the power of government is invoked directly to stifle speech, similar considerations apply. It is an unfortunate fact that in our society there are people who will react violently to movies, or other forms of expression, which offend them, whether the subject matter be gangs, race relations, or the Vietnam war. It may, in fact, be difficult to predict what particular expression will cause such a reaction, and under what circumstances. To impose upon the producers of a

---

[2]See Chafee, Free Speech in the United States (1948) page 425; Emerson, The System of Freedom of Expression (1970) page 341; Tribe, American Constitutional Law (1978) pages 617-623. Relevant case law includes: *Street* v. *New York* (1969) 394 U.S. 576, 592 [22 L.Ed.2d 572, 585, 89 S.Ct. 1354] ("It is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of the hearers"); *Terminiello* v. *Chicago* (1949) 337 U.S. 1, 4 [93 L.Ed. 1131, 1134, 69 S.Ct. 894] ("a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger"); see also *Cohen* v. *California* (1971) 403 U.S. 15 [29 L.Ed.2d 284, 91 S.Ct. 1980]; cf. *Feiner* v. *New York* (1951) 340 U.S. 315, 316-318 [95 L.Ed. 295, 297-298, 71 S.Ct. 303].

motion picture the sort of liability for which plaintiffs contend in this case would, to a significant degree, permit such persons to dictate, in effect, what is shown in the theaters of our land.

Plaintiffs argue that their second cause of action, for fraud, is immune from these First Amendment considerations, because misrepresentation is among the "narrowly limited classes of speech [which] may be prevented or punished by the state consistent with the principles of the First Amendment." (*Olivia N.* v. *National Broadcasting Co.* (1977) 74 Cal.App.3d 383, 388 [141 Cal.Rptr. 511].) In the context of this case, however, such an argument merely substitutes labels for reality. Plaintiffs do not contend, nor is there any evidence, that petitioners expressly misrepresented any facts. Rather, they contend that the advertisements for the movie *impliedly* represented that the movie could be safely attended, simply by inviting people to attend. If advertising for a movie at a public theater could give rise to a cause of action for fraud against the producer on the ground that he participated in the advertising, and that he knew or should have known that the movie might attract persons of violent propensity at a particular theater, First Amendment considerations are as applicable as where liability is sought to be imposed directly for the failure to warn.

While First Amendment principles are not absolute, and liability may exist for tortious conduct in the form of speech (*Weirum* v. *RKO General, Inc., supra,* 15 Cal.3d 40, 48), plaintiffs concede there was nothing tortious about the contents of "Boulevard Nights," and that the movie itself is within the ambit of protected expression. Even so, we refrain from deciding this case on First Amendment grounds alone, for there may well be circumstances in which the state could hold a party responsible for warning, or taking protective action, against the foreseeable reaction of persons to protected speech without violating the First Amendment. Rather, we proceed to consider whether there exists a basis for liability on the part of petitioners under established principles of common law—a question to which the First Amendement principles we have discussed are relevant, even if not determinative.

## II.

Although foreseeability of harm is a primary consideration in determining duty (*Dillon* v. *Legg* (1968) 68 Cal.2d 728, 739 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316]) and is a question of fact for the jury, the threshold determination that a duty is owed plaintiff is primarily a question of law (*Weirum* v. *RKO General, Inc., supra,* 15 Cal.3d 40, 46.) "In determining the existence of a duty of care in a given case, pertinent factors to consider include the 'foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defen-

dant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.' [Citation.]" (*Davidson* v. *City of Westminster* (1982) 32 Cal.3d 197, 203 [185 Cal.Rptr. 252, 649 P.2d 894].)

In urging the existence of a duty on the part of petitioners, plaintiffs rely principally upon *Weirum* v. *RKO General, Inc., supra,* 15 Cal.3d 40. In *Weirum,* a rock radio station with an extensive teenage audience conducted a contest which rewarded the first contestant to locate a peripatetic disk jockey. Two minors driving in separate automobiles attempted to follow the disk jockey's automobile to its next stop, and, in the course of their pursuit, one of them negligently forced a car off the highway, killing its sole occupant. In a suit filed by the surviving wife and children of the decedent, the jury rendered a verdict against the radio station, and the consequent judgment was affirmed.

The Supreme Court in *Weirum* concluded, first, that the record amply supported the finding of foreseeability: "It was foreseeable that defendant's youthful listeners, finding the prize had eluded them at one location, would race to arrive first at the next site and in their haste would disregard the demands of highway safety." (15 Cal.3d at p. 47.)

Next, the court held that it was of no consequence that the harm to decedent was inflicted by third parties acting negligently. "If the likelihood that a third person may react in a particular manner is a hazard which makes the actor negligent, such reaction whether innocent or negligent does not prevent the actor from being liable for the harm caused thereby." (*Ibid.*) It noted, however, that "virtually every act involves some conceivable danger. Liability is imposed only if the risk of harm resulting from the act is deemed unreasonable—i.e., *if the gravity and likelihood of the danger outweigh the utility of the conduct involved.* [Citation.] [¶] We need not belabor the grave danger inherent in the contest broadcast by defendant. The risk of a high speed automobile chase is the risk of death or serious injury. Obviously, *neither the entertainment afforded by the contest nor its commercial rewards can justify the creation of such a grave risk.* Defendant could have accomplished its objectives of entertaining its listeners and increasing advertising revenues by adopting a contest format which would have avoided danger to the motoring public." (15 Cal.3d at pp. 47-48, italics added.)

The defendant in *Weirum* argued that imposition of a duty would lead to unwarranted extensions of liability, hypothesizing that "entrepreneurs will henceforth be burdened with an avalanche of obligations: an athletic department will owe a duty to an ardent sports fan injured while hastening to purchase one of a limited number of tickets; a department store will be liable for injuries

incurred in response to a 'while-they-last' sale." (15 Cal.3d at p. 48.) That argument, the court held, "suffers from a myopic view of the facts presented here. *The giveaway contest was no commonplace invitation to an attraction available on a limited basis.* It was a competitive scramble in which the thrill of the chase to be the one and only victor was intensified by the live broadcasts which accompanied the pursuit. In the assertedly analogous situations described by defendant, any haste involved in the purchase of the commodity is an incidental and unavoidable result of the scarcity of the commodity itself. In such situations there is no attempt, as here, to generate a competitive pursuit on public streets, accelerated by repeated importuning by radio to be the very first to arrive at a particular destination. *Manifestly the 'spectacular' bears little resemblance to daily commercial activities.*" (*Ibid.*, italics added.)

Finally, the court rejected defendant's argument, based on section 315 of the Restatement Second of Torts, that it owed no duty to control the conduct of third parties absent a special relationship. This rule, the court held, "has no application if the plaintiff's complaint, as here, is grounded upon an affirmative act of defendant which created an undue risk of harm. . . . Liability is not predicated upon defendant's failure to intervene for the benefit of decedent but rather upon its creation of an unreasonable risk of harm to him." (15 Cal.3d at pp. 48-49.)

█ Here, by contrast to *Weirum,* the petitioners' activity in producing a motion picture and arranging for its distribution, is socially unobjectionable—and, in light of First Amendment considerations, must be deemed so even if it had the tendency to attract violence-prone individuals to the vicinity of theaters at which it was exhibited. That activity, therefore, cannot be the predicate for imposition of liability on the theory of *Weirum.* Nor are petitioners accused of any additional "affirmative act . . . which created an undue risk of harm." It is not claimed, for example, that petitoners are responsible for any conduct which increased the risk of violence on the part of persons in the vicinity of the theater, in order to obtain some commercial rewards. Rather, liability is sought to be imposed for their failure to warn the public of potential danger from third persons and for their failure to take undefined steps to protect the public from such danger.

Relevant to our analysis, therefore, are cases involving the duty to warn of potential danger from third parties. █ "As a general rule, one owes no duty to control the conduct of another, nor to warn those endangered by such conduct. Such a duty may arise, however, if '(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relation exists between the actor and the other which gives the other a right to protection.' [Citations.]" (*Davidson* v. *City of Westminster, supra,* 32 Cal.3d at p. 203.)

In *Johnson* v. *State of California* (1968) 69 Cal.2d 782 [73 Cal.Rptr. 240, 447 P.2d 352], the state placed a boy with homicidal tendencies in a foster home without warning the foster parents. In an opinion by Justice Tobriner, the court "dispose[d] summarily of the contention, not strenuously pressed . . . that . . . the state owed no duty of care to [the foster parent]." (*Id.,* at p. 785.) The court reasoned that prior cases "impose a duty upon those who create a foreseeable peril, not readily discoverable by endangered persons, to warn them of such potential peril." (*Id.,* at p. 786, fn. omitted.)

In *Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166], the Supreme Court held that a special relationship existed between psychotherapists and a patient which "may support affirmative duties for the benefit of third persons" (*id.,* at p. 436); and that under the circumstances of that case, the therapists had a duty to warn a known and specifically foreseeable and identifiable victim of the patient's threats against him. (See *Thompson* v. *County of Alameda* (1980) 27 Cal.3d 741, 752 [167 Cal.Rptr. 70, 614 P.2d 728, 12 A.L.R.3d 701].)

In *Thompson, supra,* 27 Cal.3d 741, the court held that a county could not be held liable for its failure to warn the local police and the parents of neighborhood children that it was about to release from custody a certain individual despite its alleged knowledge that the individual had latent, extremely dangerous and violent propensities regarding young children and violence connected therewith was a likely result of releasing him into the community, and that the individual had indicated that he would, if released, take the life of a young child residing in the neighborhood. (*Id.,* at p. 746.) The court explained that in *Tarasoff* it had "made clear that the therapist has no *general* duty to warn of each threat. Only if he 'does in fact determine, or under applicable professional standards reasonably should have determined, that a patient poses a serious danger of violence to others, [does he bear] a duty to exercise reasonable care to protect the *foreseeable victim* of that danger.' [Citation.]" (*Id.,* at p. 752, italics in original.) Noting that plaintiffs had not alleged that a "direct or continuing relationship between them and County existed through which County placed plaintiffs' decedent in danger, nor that their decedent was a foreseeable or readily identifiable target of the juvenile offender's threats," it "decline[d] to impose a blanket liability on County for failing to warn." (*Id.,* at p. 753.)

The court based this conclusion "in part on policy considerations and in part upon an analysis of 'foreseeability' within the context of this case." (*Thompson, supra,* 27 Cal.3d at p. 753.) In addition to noting the "inherently imprecise" nature of parole and probation decisions, and the necessary role that such decisions play in the correctional system, the court foresaw "significant practical obstacles in the imposition of a duty in the form that plaintiffs seek,

concluding that it would be unwieldy and of little practical value." (*Id.,* at pp. 753-754.) In light of the volume of releases, notification to the public at large of the release of each offender who has a history of violence and who has made a generalized threat at some time during incarceration or while under supervision would, under the court's view, "produce a cacophony of warnings that by reason of their sheer volume would add little to the effective protection of the public" (*id.,* at pp. 754-755); and, in addition, they would be "difficult to give" (*id.,* at p. 755). "In summary," the court concluded, "whenever a potentially dangerous offender is released and thereafter commits a crime, the possibility of the commission of that crime is statistically foreseeable. Yet the Legislature has concluded that the benefits to society from rehabilitative release programs mandate their continuance. Within this context and for policy reasons the duty to warn depends upon and arises from the existence of a prior threat to a specific identifiable victim." (*Id.,* at p. 758.)

In *Davidson* v. *City of Westminster, supra,* 32 Cal.3d 197, the most recent case on this subject, the court applied the reasoning in *Tarasoff* and *Thompson* to hold that police officers had no duty to warn a laundromat patron of the presence of an individual whom the police had under surveillance and who, the officers had reason to believe, had stabbed women at the same or nearby laundromats on three previous occasions. The recognition of such a duty, the court stated, "would raise difficult problems of causation and public policy" (*id.,* at p. 208), since it would "necessarily impl[y] a general duty to warn other potential victims in the vicinity," and that "[w]hile under some circumstances the police may conclude that such a course of conduct is prudent and necessary, our past decisions teach that it is inappropriate to impose such a duty—which may paralyze a neighborhood—under pain of tort liability. . . . Although the facts as alleged may establish that Yolanda, or indeed any other woman using the laundromat, was a reasonably foreseeable victim as in *Tarasoff,* that factor alone does not suffice to establish a special relationship with the officers imposing upon them a duty to warn or protect." (*Id.,* at pp. 208-209; see also *Kane* v. *Hartford Accident & Indemnity Co.* (1979) 98 Cal.App.3d 350 [159 Cal.Rptr. 446]; *Vu* v. *Singer Co.* (N.D.Cal. 1981) 538 F.Supp. 26.)

In both *Thompson* and *Davidson* there existed weighty policy arguments against the imposition of a duty, arising out of the public status and functions of the defendants. In *Tarasoff,* as well, the limited scope of the duty imposed was dictated in part by policies supporting the confidential relationship between therapist and client. (See *Thompson, supra,* 27 Cal.3d at p. 752.) We recognize, of course, that those same policies are not present here. There are, however, other countervailing policies, arising out of the First Amendment, which we have discussed, and which do have substantial bearing upon the issue whether there should be imposed upon petitioners the exposure to liability of the kind for which plaintiffs contend.

Moreover, as in *Thompson,* there exist significant practical obstacles in the imposition of a duty to warn in this context. We live, regrettably, in a violence-prone society, and predicting when, or where, individuals or groups might react violently to the showing of a particular movie is likely to be a difficult matter, at best. The nature of the warnings that would be required—in the advertisements for the movie (or perhaps on the marquees of theaters?)—would of necessity be general in nature, and addressed to the public at large. And, there is nothing that the public could effectively do in response to such a warning, in a situation such as this, except to stay away from the movie—and not only from the movie, but from the theater as well, since plaintiff's injury, from all that appears, occurred by reason of her location at the moment and not by reason of her having seen the film. It seems unlikely that a volume of such warnings would contribute measurably to the effective protection of the public.

Nor does the case law support the imposition upon petitioners, in a situation such as this, of a duty to provide security protection on public streets outside every theater at which their movie is shown. Even owners of property have been held not to be responsible for taking steps to prevent criminal acts of violence upon invitees, absent a particularized showing of foreseeability (*Totten* v. *More Oakland Residential Housing, Inc.* (1976) 63 Cal.App.3d 538, 543 [134 Cal.Rptr. 29]; *Rogers* v. *Jones* (1976) 56 Cal.App.3d 346, 350-352 [128 Cal.Rptr. 404]), and a weighing of the burden of taking precautionary measures against the apparent risk of harm (*id.,* at p. 352). And, courts have been particularly reluctant to impose liability upon a defendant for the defective condition of property which the defendant does not own, possess, or control. (*Whitney's at the Beach* v. *Superior Court* (1970) 3 Cal.App.3d 258, 269 [83 Cal.Rptr. 237].) We have been cited to no authority which would impose upon petitioners, on the facts presented, the sort of liability for which plaintiffs contend.[3]

■ Courts have an obligation to exercise particular care in passing upon summary judgment motions in cases implicating First Amendment interests. "[B]ecause unnecessarily protracted litigation would have a chilling effect upon the exercise of First Amendment rights, speedy resolution of cases involving free speech is desirable. [Citation.] Therefore, summary judgment is a favored remedy . . . ." (*Good Government Group of Seal Beach, Inc.* v. *Superior*

---

[3]Plaintiffs assert that liability should be imposed because petitioners "undertook the burden of protecting the Plaintiffs" by recommending to Warner Brothers that security guards be posted at theaters exhibiting the film. They cite as authority section 449 of the Restatement Second of Torts, comment a: "It is only where the actor is under a duty to the other, because of some relation between them, to protect him against such misconduct, or where the actor has undertaken the obligation of doing so, or his conduct has created or increased the risk of harm through the misconduct, that he becomes negligent." The recommendation that security guards be posted falls far short of an "undertaking" to protect plaintiff. Nor did defendants' conduct "increase the risk of harm" in any way. Section 449, comment a is simply inapplicable on these facts.

*Court* (1978) 22 Cal.3d 672, 685 [150 Cal.Rptr. 258, 586 P.2d 572]; see also *Okun* v. *Superior Court* (1981) 29 Cal.3d 442, 460 [175 Cal.Rptr. 157, 629 P.2d 1369].) Of course, this does not mean that summary judgments should be granted where there exists a triable issue of material fact. ▮ We conclude there was no such issue here, however, and, that the motion for summary judgment should have been granted. (*Whitney's at the Beach* v. *Superior Court, supra,* 3 Cal.App.3d 258, 271.)

It is ordered that a peremptory writ of mandate issue commanding respondent superior court to set aside its order denying motion for summary judgment, and to order summary judgment in favor of petitioners as provided in section 437 of the Code of Civil Procedure in accordance with petitioners' motion therefor.

Miller, J., and Smith, J., concurred.

The petition of real parties in interest for a hearing by the Supreme Court was denied February 16, 1983. Grodin, J., did not participate therein. Mosk, J., was of the opinion that the petition should be granted.