[No. H000326. Sixth Dist. May 6, 1987.]

EUGENE DONG, JR., Plaintiff and Appellant, v.
BOARD OF TRUSTEES OF LELAND STANFORD JUNIOR
UNIVERSITY et al., Defendants and Respondents.

1574

**1576**

COUNSEL

Richard P. Hill and Moody & Hill for Plaintiff and Appellant.

David M. Heilbron, Robert L. Ebe, Judith A. Dickman, McCutchen, Doyle, Brown & Enersen, John P. McGlynn, Daniel J. Meagher, Jr., McGlynn, McLorg & McDowell for Defendants and Respondents.

OPINION

**BRAUER, J.**—This is an action for damages for libel, infliction of emotional distress, and breach of an implied covenant of good faith and fair dealing. The principal question which seems to confront us is this: If a prophet believes himself to be without honor in his own country, can he recover personal damages from those who heed him not? Certainly this idea would have intrigued the ancients;[1] but we conclude that even in this litigious age the time for the idea has not yet arrived.

## I.

This case reaches us by an irregular route. Plaintiff Eugene Dong, Jr., M.D. brought suit against Stanford University's Board of Trustees and certain individual defendants. On the date set for trial, before the jury was impanelled, the defendants made a series of motions *in limine,* seeking to exclude documentary evidence to be offered by Dr. Dong. The trial court granted all defense motions. Thereafter Dr. Dong's counsel said: "It is my view if I right now waived a jury and stood over there and made an opening statement [,] based upon the things you have excluded [,] that you would be in a position to nonsuit me. [¶] I'd like to save myself that breath and basically submit as an opening statement my statement of facts which is Exhibit A to the trial brief with the excision of the things in there that Your Honor has legally excised this morning. It would be my view that what would be appropriate at that point would be nonsuit with respect to the causes of action, we would then have a tightly packaged record to do with whatever we might decide is appropriate." This suggestion was accepted by defense counsel, and so the court ruled as follows: "It's stipulated then in light of the Court's rulings and only because of the Court's rulings on the motions in limine that Counsel stipulate that a nonsuit would be granted, given the offer of proof of the opening statement of Plaintiff being Exhibit A to the Plaintiff's trial brief . . . . [¶] Based upon that the Court grants a nonsuit to

---

[1]Among others, Amos, Daniel, Elijah, Ezekiel, Hosea, Isaiah, Jeremiah, Joel, Jonah, Micah, Obadiah, and Samuel come to mind. Even Cassandra might have expressed an interest.

each of the defendants." Judgment was entered in favor of all defendants, and from that judgment Dr. Dong appeals.

■ We entertain this appeal because this state's Supreme Court has held that "there is an exception to the rule that a party may not appeal a consent judgment. If consent was merely given to facilitate an appeal following adverse determination of a critical issue, the party will not lose his right to be heard on appeal." (*Building Industry Assn.* v. *City of Camarillo* (1986) 41 Cal.3d 810, 817 [226 Cal.Rptr. 81, 718 P.2d 68].)

■ In connection with a motion for nonsuit upon an opening statement, a trial court "must accept as true all of the facts set forth in the statement, must give those facts all the value to which they are legally entitled, and must indulge in every legitimate inference which may be drawn therefrom." (*Timmsen* v. *Forest E. Olson, Inc.* (1970) 6 Cal.App.3d 860, 867-868 [86 Cal.Rptr. 359].) "[¶] In an appeal from a judgment of nonsuit, the reviewing court is guided by the same rule requiring evaluation of the evidence in the light most favorable to the plaintiff." (*Carson* v. *Facilities Development Co.* (1984) 36 Cal.3d 830, 839 [206 Cal.Rptr. 136, 686 P.2d 656].)

In this case we hold that the trial court ruled correctly, and that the judgment should be affirmed.

## II.

### A. *Dramatis Personae*

Before addressing the facts we pause to introduce our cast.

Dr. Eugene Dong, Jr., the plaintiff, is a physician and a faculty member of Stanford University's (University) school of medicine. Defendant Zoltan J. Lucas, M.D., was once a faculty member at the University's school of medicine, but he is no longer so employed. Defendant Clayton Rich, M.D., is the dean of the University's medical school and vice-president for medical affairs. Defendant James B.D. Mark, M.D. was at one time acting chairman of the department of surgery at the University's medical school. Defendant John J. Schwartz is a lawyer, counsel for medical affairs and assistant vice-president of the University.

The University was made a party defendant apparently on the basis that it was vicariously liable, under the doctrine of respondeat superior, for the acts of individual defendants.

### B. *The Opening Statement Summarized*

"Eugene Dong, Jr., M.D., joined the Stanford faculty in July, 1966. He was employed, pursuant to an oral contract, by the School of Medicine as

a researcher and teacher in the Department of Cardiovascular surgery." One of his duties "was to participate in the maintenance of high ethical standards in research." He rose through the ranks of instructor, assistant, professor, and associate professor; and in 1972 he was appointed associate professor of cardiovascular surgery "with tenure." "During the late sixties and early seventies, Dr. Dong was a principal in a Stanford research team that developed a worldwide reputation in heart transplantation. During this period he acted as principal or co-principal investigator in research programs supported by millions of dollars of public and private funds." "Dr. Dong's rate of advancement . . . had been at least equal to, if not more accelerated than his peers'."

In early 1973 Randall Morris, a graduate student who had been engaged in research under Dr. Lucas, informed Dr. Dong that "[Dr.] Lucas was reporting scientific conclusions that were not supported by work done or data actually derived." In June of 1973 Dr. Dong wrote to Dr. Robert A. Chase (chairman of the department of surgery) detailing the Morris allegations. Dr. Chase appointed an ad hoc committee of tenured faculty members (headed by a Dr. Raffel) to investigate "the Morris charges as presented by plaintiff."

In January of 1975 "the then acting Chairman of the Department of Surgery, [defendant] Dr. [James B. D.] Mark, informed plaintiff that the Raffel committee had reported its findings in March of 1974 and had concluded that the information supplied to the committee did 'not support Professor Dong's assertions as to the publications in question.' " Dr. Mark indicated in his letter "that the Department of Surgery would take no further action in the matter." "Dr. Dong was not interviewed by the committee, and, to Dr. Dong's knowledge, the committee did not examine the laboratory data underlying the conclusions in question."

"With this response to charges he believed to be valid, Dr. Dong began to be concerned about his own ability as a scientific analyst, and about his position as a discredited challenger of the honesty of the work of a fellow scientist."

Then in February of 1975, A. Baronio Martins, Ph.D., who had been engaged in research under Dr. Lucas, "wrote Dr. Mark with a whole new set of allegations concerning the validity of certain research performed by [Dr.] Lucas." "Dr. Mark appointed another ad hoc investigatory body, the Feigen committee [headed by Professor George A. Feigen], to review Martins' charges." That committee requested the assistance of Dr. Dong in analyzing the charges. Drs. Dong, Martins, and Randall Morris all testified before the committee.

On July 24, 1975, while the Feigen committee was still investigating, Dr. Lucas responded in kind. He "wrote a letter to the Feigen committee

accusing Dr. Dong of 'consumer fraud,' 'public fraud,' and 'scientific fraud' in connection with certain papers Dr. Dong had [previously] co-authored. [Dr.] Lucas has testified under oath in another lawsuit that he didn't have any evidence to support these charges against Dr. Dong."

Dr. Dong remained unaware of Dr. Lucas's challenge until November of 1978.

The Feigen committee submitted its report to Dr. Mark in October of 1975. In its cover letter the committee noted the charges made by Dr. Lucas against Dr. Dong ["These allege that Professor Dong was guilty of the same type of behavior that he attributed to Dr. Lucas"], but ignored them ["We did not examine these allegations but include them for the record"]. In its summary analysis and recommendations the committee wrote about Dr. Lucas: "Beyond this, the question of fabrication and fraud is unresolved. We are of the opinion that it may have occurred as Professor Dong alleges. Circumstantially, there was 'motive' for some of the errors. On the other hand, there would appear to be little gain for Professor Lucas in the case of the majority of errors. In these cases it seems more likely that he was care-less or incompetent, rather than guilty of fraud. We conclude that while the case for fraud has not been established beyond a reasonable doubt we main-tain deep concern that some of the work may in fact have been fraudulent. We therefore recommend to you that a formal hearing to determine these questions of motive should be concerned." The committee unanimously agreed "that there exist sufficient grounds for the continuation of the inquiry by an appropriate agency of the University." But the inquiry was never continued.

Dr. Dong was unable to obtain a copy of the Feigen report from the University, despite his repeated requests. He offered to provide the Feigen committee with additional evidence of errors in Dr. Lucas's research. That evidence was declined. In January of 1976 Dr. Mark wrote to Dr. Dong that the Feigen committee "is considering further information and I expect that they will report to me in due course."

"On February 11, 1976, [Dr.] Lucas wrote to Norman Shumway, M.D., Chairman of Dr. Dong's academic department, and accused Dr. Dong of fraud in scientific research. [Dr.] Lucas demanded an investigation of these charges. Dr. Shumway in fact requested a response [from] Dr. Dong, and, apparently satisfied by this response, pursued the matter no further."

Meanwhile Dr. Dong began communicating with various officials of the National Institutes of Health (NIH) of the Department of Health, Education, and Welfare. NIH instituted its own investigation, and began a series of

communications with University officials.[2] In April of 1976 the University's counsel, John Schwartz, told NIH officials that the Raffel committee's report had been rejected by the University as "unsatisfactory," and that the Feigen committee's report had not been released because that committee was still in session. In May of 1976 Schwartz told NIH officials that Dr. Dong was a "complainer" and had a "vendetta" against Dr. Lucas. In December of 1976 one of Schwartz's assistants wrote to NIH that the Feigen committee "was reconvened and has submitted a report to James B.D. Mark, M.D., Acting Chairman of the Department of Surgery. This report is presently being reviewed by Dr. Mark and other appropriate University officials, and some points in the report need to be clarified with the committee before it will be ready for final distribution." But in fact there was no reconvening of the Feigen committee, and there were no points which remained to be clarified. "Stanford just didn't want to tell NIH what the Feigen committee had really concluded and recommended. The truth was being covered up."

In March of 1977 one of Schwartz' assistants told the NIH that the Feigen committee "had submitted their report and found sloppy data but no illegal actions." In May of 1977 the same assistant told NIH that the Feigen committee "concluded, in general, that Dr. Lucas was not guilty of any fabrications or fallacious research reporting but perhaps guilty of sloppy laboratory administration." He further told NIH that a new head of the department of surgery, Dr. John Collins, would review the committee report.

Then in June of 1977 the press got hold of the story. According to one article, John Schwartz told an NIH official that the University had set up another committee to investigate the Martins charges, and that " 'as a result of their review, there were no wrong-doings.' " But the article also quoted Schwartz as saying that "no new official probe [had] been launched 'so far' " since the Feigen committee report of October 2, 1975. Another article quoted Schwartz as saying that "[I]n committee reports of 1974 and 1975 neither committee found any evidence of any deliberate scientific misrepresentation."

By this time Martins had filed a lawsuit against Dr. Lucas.[3] In the course of that lawsuit Dr. Lucas was obliged to answer interrogatories under oath.

---

[2] On January 30, 1976, NIH issued a memorandum which said, among other things: "NIH has reviewed Dr. Dong's allegations that Dr. Zoltan J. Lucas introduced serious discrepancies in certain grant applications and in a contract proposal. It is our conclusion that with a single exception there are no discrepancies in the data or use of the data as presented by Dr. Lucas." "There also appears to be *no* pretense of deception or attempt at withholding relevant data from NIH reviewers." (Italics in original.) A copy of the NIH memorandum was sent to Dr. Dong on March 9, 1976, and he thereafter complained to NIH that its report was superficial. Yet these facts were not mentioned in Dr. Dong's opening statement.

[3] The Martins lawsuit ultimately was settled out of court, upon terms not revealed in our record.

His answers suggested that in applying for government grants he had misstated his own bibliography (i.e., what articles he had published, and where); and so "a separate investigation of the accuracy of [Dr.] Lucas' bibliographical citations in grant applications was begun at the insistence of NIH." In July of 1977 John Wilson, M.D., an associate dean for faculty affairs, was instructed to head a committee to conduct the investigation. This investigation was not related to the substantive allegations of fraudulent data previously made by Dr. Dong.

In August of 1977, just as the Wilson committee was getting underway, Dr. Lucas resubmitted "his 'fraud' charges" against Dr. Dong to the latter's department head, Dr. Shumway. Dr. Shumway consulted with other members of his own department; and on September 1, 1977, he wrote to Dr. Lucas that "our Departmental committee feels that no true case has been raised by your letter of February 11, 1976, and unless there is further evidence, we suggest the matter be dropped."

"During this same period in late 1977, Dr. Dong's office was moved, without consultation with him, from the site of the rest of the office comprising the administrative center of his department, to an isolated, small office that was formerly a storage closet for laboratory equipment."

On June 6, 1978, Dr. Lucas wrote to defendant Clayton Rich, M.D., the dean of the University's medical school, realleging his original charges of "fraud" against Dr. Dong. "[Dr.] Lucas' original July 24, 1975 articulation of his now twice-rejected 'consumer fraud,' 'scientific fraud,' and 'public fraud' charges was attached to the June 6 letter. The June 6 letter also contained the outright lie that the Feigen committee members 'were not prepared to offer an evaluation of my counter-charges, but concluded that the counter-charges had merit and should be investigated (by another committee).'" Dr. Rich asked the Wilson committee to investigate the charges maintained by Dr. Lucas against Dr. Dong. Dr. Wilson asked the assistance of the University's legal staff.

"During early October, 1978, Dr. Dong found out informally through Dr. Shumway about this latest investigation of charges against him. He saw for the first time [Dr.] Lucas' original accusatory letter of July 24, 1975. He was so scared and confused about these 'undead' charges he went to see a lawyer."

In November of 1978 Dr. Dong first saw a copy of the full Feigen committee report. "For the first time Dr. Dong saw the conclusions reached some three years earlier vindicating his analysis and committment [*sic*] to research ethics and condemning [Dr.] Lucas."

In January of 1979 defendant John Schwartz informed the NIH by letter that any previous communications, to the effect that the Feigen committee had found Dr. Lucas "not guilty" of any fraud, might have been due to a misunderstanding.

On March 5, 1979, the University suspended Dr. Lucas without pay for 12 weeks, "on grounds of professional misconduct in misstating the status of his publications in bibliographies submitted in applications and reports to the NIH." The NIH, when informed of the suspension, closed its investigation on May 24, 1979.

Dr. Dong filed the present lawsuit on June 5, 1979.

"The final touches on the truthful picture were provided by the sworn testimony of forensic scientist and 'questioned documents' expert Kenneth D. Parker in December, 1980. Mr. Parker examined the Lucas laboratory notebooks that underlay some of the research findings that had been challenged by A. Baronio Martins and Dr. Dong. He [i.e., Parker] found the notebooks to have been altered to add fictitious data and to change data already entered. He called the research results 'science fiction.'[4] This was the simple truth Gene Dong had been after for years."

"Dr. Dong's salary is now below the twenty-fifth percentile for medical school faculty with his training and experience. His students have been promoted past him, while he has not been considered for promotion. He has had to take anti-ulcer medication to combat the symptoms of emotional distress. But he was right the whole time."

Thus endeth the opening statement.

### III.

Dr. Dong's first amended complaint contained six causes of action. Summary judgment (which is not challenged here) disposed of cause three entirely, and of cause two as to all defendants save Dr. Lucas and the University. After summary judgment the status of the complaint was this:

Cause one is aimed at Dr. Lucas alone. In essence it alleges that Dr. Lucas sent a letter to the Feigen committee in July of 1975, accusing Dr. Dong of "consumer fraud," "public fraud," and "scientific fraud"; that the letter was written with malice; that the statements in the letter were libelous on their face; and that as a proximate result of the letter's publication Dr. Dong "has

---

[4]This testimony allegedly was given in a deposition taken in the lawsuit filed against Dr. Lucas by A. Baronio Martins.

suffered loss of his reputation, shame, fear and hurt feelings, all to his general damage . . . ."

Cause two is leveled at Dr. Lucas and the University. It alleges that Dr. Lucas sent a letter to Dr. Rich in June of 1978, accusing Dr. Dong of "violating good scientific practice," "consumer fraud upon the public," "serious violations of scientific ethics," and "grossly exaggerated claims"; that the letter was written with malice; that the statements were libelous on their face; and that as a proximate result of that letter's publication Dr. Dong "has suffered loss of his reputation, shame, fear and hurt feelings," etc. It further alleges that the University, as Dr. Lucas's employer, was responsible for his conduct.

All named defendants except Dr. Lucas are targets of cause four. It is there alleged that the defendants intentionally conspired together to inflict emotional distress on Dr. Dong, by (1) concealing the true evaluations of committees, (2) misrepresenting those evaluations to the public and to agencies of the federal government, (3) "repetitively ordering extraordinary proceedings aimed at plaintiff's academic, scientific and professional integrity on the basis of identical and discredited accusations," and (4) "concealing the scope, nature and seriousness of such charges from the plaintiff . . . ."

Cause five in essence alleges that the defendants negligently performed the sins alleged in cause four.

Cause six alleges that the University breached its implied covenant of good faith and fair dealing with Dr. Dong, by doing the acts alleged in causes one, two, and four, and "by impeding plaintiff's discharge of his academic and scientific duties." It is further alleged that as a proximate result of the breach Dr. Dong suffered "severe emotional distress" and "has been deprived of certain career advancements in the form of promotions and salary advances which would have been normal incidents of said employment agreement . . . ."

## IV.

On the first day of trial Dr. Lucas moved *in limine* to exclude from evidence his letters (1) to the Feigen committee, dated July 24, 1975, and (2) to defendant Dr. Clayton Rich, dated June 6, 1978. Both letters were presented to the trial court, and the record before us plainly reveals that the court read them. The court granted the motion on the ground that both letters, taken as a whole, represented statements of opinion rather than statements of fact.

Initially Dr. Dong contends that all of the motions *in limine* were improper. For example, he points out that the question of whether Dr. Lucas's letters stated fact or opinion was raised by demurrer well in advance of trial, and the demurrer was overruled. He further argues that the motions *in limine* were actually motions for summary judgment in disguise, and were not made in compliance with Code of Civil Procedure section 437c. ■ But an *in limine* motion for exclusion of evidence is addressed neither to allegations contained in a pleading nor to causes of action or specific issues; instead, it is directed toward specific evidence. A motion *in limine* is "designed to prevent the prejudicial effect that may result when an objection to evidence is sustained, and the jury is then instructed to disregard the evidence. To avoid the necessity of 'unringing the bell,' the *motion in limine* allows a party to obtain an order excluding evidence 'in advance' on any ground which would be sufficient as an objection." (6 Witkin, Cal. Procedure (3d ed. 1985) Proceedings Without Trial, § 2, p. 328.)

■ Whether a given communication constitutes a statement of fact or of opinion is a question of law to be decided by the court. (*Baker* v. *Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 260 [228 Cal.Rptr. 206, 721 P.2d 87].) "In making such a determination, the court must place itself in the position of the hearer or reader, and determine the sense or meaning of the statement according to its natural and popular construction." (*Ibid.*) "California courts have developed a 'totality of the circumstances' test to determine whether an alleged defamatory statement is one of fact or of opinion. First, the language of the statement is examined. For words to be defamatory, they must be understood in a defamatory sense. . . . Where the language of the statement is 'cautiously phrased in terms of apparency,' the statement is less likely to be reasonably understood as a statement of fact rather than opinion." (*Id.,* at pp. 260-261.) Next, the context in which the statement was made and facts surrounding the publication must also be considered. (*Id.,* at p. 261.) The questioned publication must be considered in its entirety; it cannot be divided into segments and each portion treated as a separate unit. (*Ibid.*)

However, "[e]ven if a statement appears in opinion form, if it implies factual assertions, some 'courts have held that it should not receive the benefit of First Amendment protection as an opinion.' [Citation.] [¶] This principle is reflected in section 566 of the Restatement Second of Torts. It provides: 'A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion.' " (*Id.,* at p. 266, fn. partially omitted.) "Thus, courts have found statements to be nonactionable opinion when the facts supporting the opinion are *disclosed.*" (*Id.,* at p. 266, fn. 7, italics in original.)

Guided by these principles we turn to the letters themselves, copies of which we have examined.

A. *The July 24, 1975, Letter*

Dr. Lucas's letter to Professor George S. Feigen, dated July 24, 1975, is typewritten, single-spaced, and five pages long minus exhibits. It contains a considerable body of scientific data and description which we are unable to evaluate; but it is apparent that the letter is critical of certain research papers previously presented by Dr. Dong to various medical societies.

At the close of his opening paragraph Dr. Lucas wrote, "I request that the Committee evaluate whether Dr. Dong himself has practiced many of the same things he has accused me of doing." At the close of his second paragraph he wrote, "I wish to suggest that [Dr.] Dong committed the same misdeed that he accused me, that of preparing an abstract before the completion of its experiments." Dr. Lucas next summarized certain data presented by Dr. Dong, criticized that data, and then said, "I suggest that the paper over-stepped the scientific data, that the authors were aware of this, and that this constitutes *public fraud*. (I am not a lawyer and I use the latter terminology only to make a case that parallels [Dr.] Dong's letter to the Feigen committee.)" (Italics in original.)

Dr. Lucas then critically examined two other papers co-authored by Dr. Dong, and the data supporting the conclusions. He summarized thus: "[¶] I believe that the above show that in some of [Dr.] Dong's reported scientific works there are 1) inadequate explanations of procedures, 2) preparation of an abstract before completion of all the experiments, 3) deceptive reporting of data in a second publication on the same subject as new material, 4) public and scientific fraudulent reporting of the scientific significance of their observations, and 5) suppression of certain data not supporting their high expectations of the RLB assay. [¶] I think that the parallelism between [Dr.] Dong's accusations of my work, and this analysis of his work with R. Morris, is remarkable. I think for the sake of fairness to me, and for the sake of the University's credibility in having only a single standard of professional ethics, that Dr. Dong's behavior be examined by a University peer group."

Dr. Lucas enclosed 11 exhibits with the letter.

As noted, the letter is framed in terms of Dr. Lucas's "request" for an investigation, his "suggestions" that Dr. Dong engaged in misconduct, and his "belief" in what the disclosed facts revealed. The letter did not imply that there were undisclosed defamatory facts which prompted its writing. Instead the apparent aim of the letter was to set forth the precise information

upon which Dr. Lucas's "belief" was based. Dr. Dong did not claim in his opening statement, nor does he claim here, that Dr. Lucas misrepresented the medical data which led him to his "belief." Where the facts supporting a statement are disclosed, courts have found such statements to be nonactionable opinion. (*Okun* v. *Superior Court* (1981) 29 Cal.3d 442, 451-452 [175 Cal.Rptr. 157, 629 P.2d 1369]; *Carr* v. *Warden* (1984) 159 Cal.App.3d 1166, 1170 [206 Cal.Rptr. 162].)

We conclude that the trial court correctly ruled that the July 24 letter, taken as a whole, was a statement of opinion and therefore not defamatory as a matter of law. "Although false charges that an individual has committed a crime or is personally dishonest are not protected by the First Amendment [citation], statements of opinion, no matter how outrageous or pernicious, *are* protected." (*Carr* v. *Warden, supra,* 159 Cal.App.3d at p. 1170, italics in original.)

### B. *The June 6, 1978, Letter*

Dr. Lucas's letter of June 6, 1978, addressed to Dr. Clayton Rich (then dean of the University's school of medicine), is typewritten, single-spaced, and two pages long. The thrust of the letter appears at the close of the first paragraph: "I claim that, in regards to his [Dr. Dong's] scientific work as a Professor at Stanford University, his avid hunger for publicity can be interpreted as violating good scientific practice and constituting consumer fraud upon the public. I ask that you establish an extra-departmental peer committee to evaluate these charges."

Dr. Lucas went on to say that he previously had presented the same charges to the Feigen committee, and that "they were not prepared to offer an evaluation of my counter charges [i.e., against Dr. Dong], but concluded that the counter charges had merit and should be further investigated (by another committee)." Dr. Lucas further said that with respect to two of Dr. Dong's works, "nationwide publicity was actively sought when there was precious little data to back [the] grossly exaggerated claims." His letter concludes thus:

"I consider that [Dr.] Dong's actions, then and now, are an embarrassment to [Dr.] Norman Shumway and that an internal review has yielded only a 'white wash' of [Dr.] Dong's lack of scientific propriety. On the basis of the evaluation by the Feigen Committee and [Dr.] Dong's continued quest for publicity, initially as a 'great scientist' and now as a crusader against the medical establishment, I request that you establish an extra-departmental committee to review these charges. I cannot imagine that such an investiga-

tion would be any less in scope than the investigations into my own scientific conduct."[5]

This second letter was merely a reiteration of the first letter, with one exception. The phrases "I claim that" and "I consider that" are plainly expressions of opinion. In essence Dr. Lucas criticizes Dr. Dong for seeking publicity based upon (in Dr. Lucas's opinion) "precious little data" and "grossly exaggerated claims." The exception was Dr. Lucas's statement that the Feigen committee "concluded that [my] counter charges [against Dr. Dong] had merit and should be further investigated (by another committee)." In fact the Feigen committee wrote: "These [i.e., the charges made by Dr. Lucas] allege that Professor Dong was guilty of the same type of behavior that he attributed to Dr. Lucas. We did not examine these allegations but include them for the record." The false statement was not defamatory as to Dr. Dong. ▇ In defamation actions the First Amendment requires "that the statement on which the claim is based must specifically refer to, or be 'of and concerning,' the plaintiff in some way." (*Blatty* v. *New York Times Co.* (1986) 42 Cal.3d 1033, 1042 [232 Cal.Rptr. 542, 728 P.2d 1177].) While it is true that any living person may be defamed, "[t]he civil action is personal to the plaintiff, and cannot be founded on the defamation of another; but it is of course possible that two persons may stand in such a relation that defamation of one will be found to reflect upon the reputation of the other —as where, for example, it is said that the plaintiff's mother was not married to his father; and where such is the case, the plaintiff may have an action in his own right." (Prosser and Keaton on Torts (5th ed. 1984) § 111, p. 778, fns. omitted.) Dr. Lucas's letter attributed a false conclusion to the committee, and perhaps thereby insulted it; but Dr. Dong was not a member of the committee, and took no part in writing the committee report.

▇ Furthermore, we are required to construe the letter as a whole; it cannot be considered in separate segments. (*Baker* v. *Los Angeles Herald Examiner, supra,* 42 Cal.3d at p. 261.) Taken as a whole, we agree with the trial court that the June 6 letter was a statement of opinion rather than one of fact.

## V.

▇ The trial court also ruled *in limine* that "the lab books and the evidence regarding the research and scientific work by Dr. Lucas" would be

---

[5]The third paragraph of this letter sheds some light on the previous letter of July 24, 1975. That paragraph reads in part: "[¶] On February 11, 1976, I submitted the same information to Dr. Norman Shumway with the request that he investigate the charges. He ignored the letter. In August 1977, I resubmitted the same letter. Dr. Shumway set up an internal review committee of members of his own department and in a letter to me dated September 1, 1977 (letter enclosed), concluded that there was little substance to my allegations."

excluded from evidence. "The Court finds it is not relevant and that in light of the Constitutional right of privacy it should be excluded and even if relevant under [section] 352 of the Evidence Code the danger of confusing the jury and taking up additional time on evidence that is so marginally relevant and has so little probative value is unwarranted."

The laboratory notebooks of Dr. Lucas were not before the trial court. Dr. Dong's counsel made the following offer of proof: "We have claims in the case for intentional infliction of emotional distress and bad faith, breach of a covenant of good faith and fair dealing against Stanford. It is our assertion that we can prove through Mr. Parker, the forensic analyst that the lab notebooks are forged and that the research is fictitious. If that is proven it would be our position that that would demonstrate that actions taken by Stanford vis-a-vis [Dr.] Dong were either outrageous in the sense of our fifth [*sic*] cause of action for intentional infliction of emotional distress or were bad faith in the context of our sixth cause of action for bad faith, breach of the covenant of good faith and fair dealing." Counsel further argued that "had Dr. Dong had an opportunity to get those [laboratory] books and have them analyzed he would have been able to determine for himself that they were fictitious far earlier in the process and therefore a substantial amount of his own emotional distress would have been avoided."

Dr. Dong's counsel essentially renews these same arguments on appeal. We are not impressed. If we understand the arguments correctly, they boil down to this: The University's failure to provide Dr. Dong with copies of Dr. Lucas's laboratory notes constituted a breach of the University's implied covenant of good faith and fair dealing, and caused Dr. Dong to suffer emotional distress. This train of thought is almost exquisitely preposterous.

First, the offer of proof—to the effect that "the lab books are forged"—related to evidence developed *after* this lawsuit was filed. Therefore it is inconceivable that his inability to inspect the laboratory notebooks contributed to Dr. Dong's alleged emotional distress; before he filed his own complaint he knew nothing of the alleged forgery. ██ ██ Second, with regard to the theory of intentional infliction of mental distress, our state Supreme Court has held that the allegedly outrageous conduct " 'must be so extreme as to exceed all bounds of that usually tolerated in a civilized community,' " and must be directed toward the plaintiff himself. (*Davidson v. City of Westminster* (1982) 32 Cal.3d 197, 209 [185 Cal.Rptr. 252, 649 P.2d 894].) "The plaintiff cannot recover merely because of hurt feelings." (Prosser and Keaton on Torts, *supra,* § 12, pp. 59-60, fn. omitted.) Third, concerning the theory of negligent infliction of emotional distress, Dr. Dong was neither a "direct victim" (*Molien v. Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916, 923 [167 Cal.Rptr. 831, 616 P.2d 813, 16 A.L.R. 4th 518]) nor a percipient witness (*Ochoa v. Superior Court* (1985) 39 Cal.3d 159,

172-173 [216 Cal.Rptr. 661, 703 P.2d 1]). Fourth, we know of no case—and none has been cited to us—which holds that a university has a duty to investigate the research of one professor in the manner dictated by another professor. Fifth, we know of no case—again, none has been cited to us—in which a university was held liable for breach of an implied covenant of good faith and fair dealing when it failed to disclose to one professor defects in the research of another professor. The dearth of authority points to the absurdity of both notions.

But, argues Dr. Dong, the University itself has a policy prohibiting secret research, and the University violated that policy. The policy reads in part: "Resolved: [¶] 1. That the principle of openness in research—the principle of freedom of access by all interested persons to the underlying data, to the processes, and to the final results of research—is one of overriding importance. Accordingly it is the decision of the Senate that that principle be implemented to the fullest extent practicable . . . ." This policy was plainly implemented for the benefit of the University. A subsequent paragraph of the policy reads: "[¶] c. Scholarly activities not accessible for scrutiny by the entire Advisory Board should not be considered in connection with appointments, reappointments or promotions." The next paragraph reads in part: "[¶] d. The University should enter no contract and accept no grant to carry out research if the grant or contract restrains *the freedom of the University to disclose* (1) the existence of the contract or grant or (2) the general nature of the inquiry to be conducted or (3) the identity of the outside contracting or granting entity or (4) *the research results* . . . ." (Italics supplied.) The policy goes on to carve exceptions for certain kinds of secret research. We do not read the policy to grant unlimited access by one professor to the research notes of another.

Dr. Lucas's laboratory notebooks were not relevant evidence simply because they had no "tendency in reason to prove or disprove any disputed fact that [was] of consequence to the determination of the action." (Evid. Code, § 210.)

## VI.

The trial court further ruled *in limine* that "[t]he motion to exclude the Feigen report and any other evidence concerning the hearings on the Lucas—the investigation into Dr. Lucas' work is granted." The precise reason for the ruling is not set forth in the record.

A copy of the Feigen committee report was attached to Dr. Dong's trial brief and was therefore before the trial court. Counsel for Dr. Dong argued that the University, in withholding the contents of the report and in

misstating the committee's conclusions to the press, caused Dr. Dong "doubt and concern over his credibility as a scientist which caused him distress, which caused him distraction from his job performance which we will show resulted in less pay and no access to promotion. It is relevant on those topics." On appeal Dr. Dong renews these arguments and adds others. He now contends (1) that the principle of academic freedom allowed him access to the Feigen committee report, for the purpose of advancing his own professional career by establishing "the existence of fraud in publicly-funded research"; and (2) that the University "restrained and chilled appellant's Academic Freedom right by erecting standardless administrative barriers, which were substantively irrational and applied to him in an arbitrary and discriminatory fashion."

These arguments presuppose that the University may be held liable in damages to a professor for refusing to divulge the contents of a disciplinary report concerning a fellow faculty member. We question the premise.

As we pointed out in *Kahn* v. *Superior Court* (1987) 188 Cal.App.3d 752, 759 [233 Cal.Rptr. 662], the exact contours of academic freedom have not been fully delineated. In a concurring opinion in *Sweezy* v. *New Hampshire* (1957) 354 U.S. 234 [1 L.Ed.2d 1311, 77 S.Ct. 1203], Justice Felix Frankfurter said this: " '[¶] It is the business of a university to provide that atmosphere which is most conducive to speculation, experiment and creation. It is an atmosphere in which there prevail "the four essential freedoms" of a university—*to determine for itself on academic grounds who may teach,* what may be taught, how it shall be taught, and who may be admitted to study.' " (*Id.,* at p. 263 [1 L.Ed.2d at p. 1332], italics added.) The quoted passage has found approval in subsequent opinions of the United States Supreme Court. (See, e.g., *Regents of University of Michigan* v. *Ewing* (1985) 474 U.S. 214 [88 L.Ed.2d 523, 533, 106 S.Ct. 507] (Stevens, J., writing for the court; *University of California Regents* v. *Bakke* (1978) 438 U.S. 265, 312 [57 L.Ed.2d 750, 785, 98 S.Ct. 2733] (lead opinion by Powell, J.).) That court has also suggested, albeit in contexts different from this case, that academic freedom is "a special concern of the First Amendment." (*Regents of University of Michigan* v. *Ewing, supra,* 474 U.S. at p. 226 [88 L.Ed.2d at p. 533]; *University of California Regents* v. *Bakke, supra,* 438 U.S. at p. 312 [57 L.Ed.2d at p. 785]; *Keyishian* v. *Board of Regents* (1967) 385 U.S. 589, 603 [17 L.Ed.2d 629, 640-641, 87 S.Ct. 675].) But the high court has not yet addressed the extent of a university's autonomy in deciding "who may teach."

We are unwilling to allow that autonomy to be circumscribed by the views of a single professor, no matter how righteous he may be. In *Franklin* v. *Leland Stanford Junior University* (1985) 172 Cal.App.3d 322 [218 Cal.Rptr. 228] a tenured professor, who disapproved of certain research then

performed at the University, incited students forcibly to shut down the research facility. The University dismissed him. He challenged the dismissal in the trial court, and lost. This court affirmed the judgment. Among other things we held: "[¶] It is clear that the constitutional freedom to speak does not license a teacher to substantially disrupt and interfere with the normal operations of his or her employer, whether they be instruction, research, or administration." (*Id.*, at p. 341.)

In the same vein, the right to speak freely does not compel an audience to attend or to listen. The opportunity for critical inquiry and analysis, vigorous advocacy, and dialogue, all in the pursuit of truth, provides no guarantee that the truth (if it is that) will be discerned and accepted. Galileo's inquisitors, for example, refused to accept the fact that the earth circles the sun. Here the University may have had a duty to the federal government to investigate the possibility of fraudulent research accomplished at the expense of federal funds. It may have had an obligation to the public at large, and to itself, to maintain high ethical standards of research in its medical school. But it had no corresponding duty to Dr. Dong as an individual; the implied covenant of good faith and fair dealing does not compel an employer to accept the views of an employee, even if those views are correct.

Furthermore, it appears that by its own regulations the University owed to Dr. Lucas the right to notice and an opportunity to be heard. The University's faculty handbook contains a "Statement on Faculty Discipline," which provides in pertinent part that in disciplinary proceedings "that member shall first be notified, in confidence, of the charges against him and shall be given the opportunity of replying to them." A faculty member wishing to contest the charges may request a full hearing in private, and is entitled to be represented by counsel and to appear in person. These provisions are totally antithetic to the notion that an investigation must reach a certain outcome.

We cannot perceive that Dr. Dong's own academic freedom was otherwise curtailed. From all that appears in the record, Dr. Dong was at all times allowed to teach, to argue, to complain, and to pursue his own research; and he apparently is still employed at the University's medical school.

We cannot and do not express any opinion as to whether Dr. Lucas in fact did false research; that question is plainly beyond our ken. But even if we assume, for the sake of argument—an assumption purely hypothetical— that Dr. Dong was entirely correct in his assertions, we nevertheless conclude that he has no cause of action against the University on that ground. In the words of Fyodor Dostoyevski, "Men reject their prophets and slay them, but

they love their martyrs and honour those whom they have slain."[6] They do not, however, award them damages; publicity brings its own reward.

Therefore the Feigen committee report was not relevant, and was properly excluded from evidence.

## VII.

 The trial court also excluded from evidence documents reflecting correspondence between the University and NIH officials. The court said this: "As far as I'm concerned they are privileged and I believe that's already been found by the Court and I would be making the same ruling in essence that this Court has already made,[7] the communications with the National Institute of Health were all privileged."

In the trial court Dr. Dong's counsel made the following "offer of proof": "[¶] We would offer that in an evidentiary sense they are relevant once again to show the quality of the conduct of Stanford, vis-a-vis Plaintiff, and that is specifically that communication to the NIH [,] Stanford misled the NIH consistent with the way they misled the public and the Plaintiff through the press about what had been found with respect to the analysis Plaintiff had done about Dr. Lucas. We would urge that this is probative of Stanford's outrageous conduct, vis-a-vis the Plaintiff. We would urge it is probative vis-a-vis Stanford's bad faith conduct vis-a-vis the Plaintiff in the employment context." Counsel also pointed to the distinction between a privileged communication and an evidentiary privilege: "[¶] There's a difference, a critical distinction between making the communication an act upon which you seek to impose liability for damages and using communications as background or relevant evidence of the motive by which other acts were taken."

On appeal Dr. Dong reiterates the latter argument. He claims the trial court "confused Civil Code § 47(2) 'privilege' with Evidence Code 'privilege.' " We are not persuaded.

We are fully aware that the distinction exists. In *Oren Royal Oaks Venture v. Greenberg, Bernhard, Weiss & Karma, Inc.* (1986) 42 Cal.3d 1157 [232 Cal.Rptr. 567, 728 P.2d 1202] the plaintiff developer sought to impose liability upon the defendants for abuse of legal process in bringing a previous CEQA action. The developer contended that the action had not been brought

---

[6]The Brothers Karamazov, book VI, chapter 3.

[7]In considering a motion for summary judgment made by the defendants, another superior court judge ruled that communications between the University and the NIH were absolutely privileged under Civil Code section 47, subdivision 2, as "having been uttered in an official proceeding authorized by law."

to protect environmental concerns, but rather to obtain a money settlement; and to establish its point it sought to rely upon certain statements made during settlement negotiations in CEQA proceedings. The defendants argued that the statements were absolutely privileged under Civil Code section 47, subdivision 2. The trial court agreed, and granted summary judgment for the defendants. Our state Supreme Court disagreed, and held this: "Indeed, on brief reflection, it is quite clear that [Civil Code] section 47(2) has never been thought to bar the *evidentiary* use of every 'statement or publication' made in the course of a judicial proceeding: answers to interrogatories or to questions at depositions are, for example, routinely admitted into evidence and relied on in determining liability even though they are clearly 'statements made in the course of a judicial proceeding.' Thus, while section 47(2) *bars certain tort causes of action which are predicated on a judicial statement or publication itself,* the section does not create an evidentiary privilege for such statements. Accordingly, when allegations of misconduct properly put an individual's intent at issue in a civil action, statements made during the course of a judicial proceeding may be used for evidentiary purposes in determining whether the individual acted with the requisite intent." (*Id.,* at p. 1168, italics in original and supplied.)

On the other hand, in *Ribas* v. *Clark* (1985) 38 Cal.3d 355 [212 Cal.Rptr. 143, 696 P.2d 637] the plaintiff sued his former wife for (among other things) intentional infliction of emotional distress and invasion of privacy. Liability was alleged to be based upon certain statements made by the ex-wife at a previous arbitration hearing. The ex-wife claimed that her statements were privileged under Civil Code section 47, paragraph 2. The trial court agreed and sustained a demurrer without leave to amend. On appeal our state Supreme Court held: "[A]lthough the statutory privilege accorded to statements made in judicial proceedings appears in the code in the chapter on defamation, it applies to virtually all other causes of action, with the exception of an action for malicious prosecution. [Citation.] Thus, the privilege will defeat claims of invasion of privacy [citations] and intentional infliction of emotional distress. [Citation.]" (*Id.,* at p. 364, cited with approval in *Oren Royal Oaks Venture* v. *Greenberg, Bernhard, Weiss & Karma, Inc., supra,* 42 Cal.3d at p. 1164, fn. 5.) The essential reasoning is this: "The salutary purpose of the privilege should not be frustrated by putting a new label on the complaint. If it is desirable to create an absolute privilege in defamation, not because we desire to protect the shady practitioner, but because we do not want the honest one to have to be concerned with libel or slander actions while acting for his client, we should not remove one concern and saddle him with another for doing precisely the same thing." (*Thornton* v. *Rhoden* (1966) 245 Cal.App.2d 80, 99 [53 Cal.Rptr. 706], cited and quoted with approval in *Oren Royal Oaks Venture* v. *Greenberg, Bernhard, Weiss & Karma, Inc., supra,* 42 Cal.3d at p. 1165.)

In this case the NIH documents plainly contained evidence of statements made by University officials in the course of a federal investigation, i.e., "in any other official proceeding authorized by law." (Civ. Code, § 47, subd. 2.) No one here contends otherwise. Dr. Dong's claims against the University and its officials were predicated upon the statements themselves. For example, in his fourth cause of action for intentional infliction of emotional distress, Dr. Dong accused the defendants of "engaging in a continuous course of outrageous conduct designed to injure and discredit the plaintiff," and to "undermine plaintiff's reputation," by (among other things) "misrepresenting [committee] evaluations, plaintiff's role in same, and plaintiff's attitude concerning the preservation of the integrity of the Stanford academic community to the courts, the public, *agencies of the federal government,* and plaintiff . . . ." (Italics added.) The sixth cause of action realleged and incorporated the fourth cause by reference, and went on to say that *"[i]n doing the acts* and entering into the conspiracies *hereinabove alleged,* the defendant Stanford has continuously breached said implied covenant of good faith and fair dealing and acted in bad faith and unfairly, by impeding plaintiff's discharge of his academic and scientific duties." (Italics added.) Therefore the NIH documents had far more than mere "evidentiary" value; they were the nuclei of two separate causes of action. Had those causes of action alleged only defamation, the documents would have been privileged under Civil Code section 47, subdivision 2. Simply because the labels affixed to the causes fell outside the defamation arena does not in this case make the documents any less privileged under the same code section. (*Ribas* v. *Clark, supra,* 38 Cal.3d at p. 364; and see the cases collected in *Block* v. *Sacramento Clinical Labs, Inc.* (1982) 131 Cal.App.3d 386, 390-391 [182 Cal.Rptr. 438].)

Accordingly we hold that the trial court was correct, and that the communications between the University and the NIH were properly excluded from evidence.

## VIII.

 Finally, the trial court excluded "evidence sought to be submitted by Plaintiff concerning Stanford's conduct of the investigation of [Dr.] Dong . . . ." On appeal Dr. Dong argues: "[¶] The content of the investigations of appellant — what was considered, when and why—is obviously relevant, if there is to be an assessment of the true motive and intent behind them, rather than uncritical *post hoc* rationalizations for them. Evidence of these investigations is clearly admissible to show the nature and extent of the chilling behavior, and the presence or absence of any permissible reason for undertaking these adverse employment actions, contemporaneously with appellant's attempted exercise of his contractually protected right of academic inquiry."

The First District of the Court of Appeal, addressing this same case, has examined this issue before. "[¶] It may well be emphasized at this point that unlike the investigation of Dr. Lucas, the investigation of Dr. Dong resulted in neither charges of misconduct, nor disciplinary proceedings, nor punishment." (*Board of Trustees* v. *Superior Court* (*Dong*) (1981) 119 Cal.App.3d 516, 527 [174 Cal.Rptr. 160].) "It appears that such communications of the University's faculty members as were considered by the committees with respect to Dr. Dong were tendered under a guaranty of confidentiality. They were thus manifestly within the [California] Constitution's protected area of privacy." (*Ibid.*) "[¶] Moreover, we are advised of no area of our law, or argument in reason, providing that an investigatory body finding no misconduct, must nevertheless allow discovery to the investigation's subject, of the evidence considered and its detailed conclusions thereon. Indeed, sound public policy appears to be otherwise." (*Id.,* at p. 528.)

We acknowledge that the First District was concerned with a discovery problem, and was writing in that context. But we think the reasoning of its opinion is sound, and by analogy appropriate here. We know of no authority, or argument in reason, which holds that an investigating committee is liable to the subject of its investigation for taking no action against him. We cannot discern any breach of the implied covenant of good faith and fair dealing in a committee's decision to leave the plaintiff alone.

Therefore this evidence also was properly excluded.

The judgment is affirmed.

Agliano, P. J., and Capaccioli, J., concurred.

A petition for a rehearing was denied May 26, 1987, and appellant's petition for review by the Supreme Court was denied July 22, 1987.